**Richard E. HOOVER, Petitioner–Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 95–1959.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 16, 1996.

Decided Dec. 18, 1996.

Terrence P. Kessler (argued and briefed), Black, McCuskey, Souers & Arbaugh, Canton, OH, for Petitioner-Appellant.

David L. Jordan, Internal Revenue Service, Gary R. Allen, Acting Chief (briefed), Richard Farber (briefed), Sara S. Holderness (argued and briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, DC, for Respondent-Appellee.

Before: SILER, MOORE, and COLE, Circuit Judges.

MOORE, Circuit Judge.

Petitioner-appellant Richard E. Hoover appeals the decision of the United States Tax Court denying him deductions on his federal income taxes for the years 1988 and 1989. Hoover asserts that the Tax Court erred in holding that $72,200 in payments to Hoover's ex-wife were not deductible as alimony pursuant to 26 U.S.C. §§ 215 and 71. For the reasons stated below, we affirm the Tax Court's decision.

Richard and Linda Hoover obtained a divorce in Ohio in 1988. An Ohio court issued a memorandum in August 1988 announcing that it would grant the divorce, divide the marital property, and, inter alia, award Mrs. Hoover "alimony as division of equity in the amount of $410,000." J.A. at 140. Mr. Hoover was to pay her at least $3000 per month "until said amount is paid in full." Mrs. Hoover was to be granted a lien on Mr. Hoover's shares in Stark Ceramics "as security for said alimony division." *Id.* at 141.

The Hoovers and their attorneys reviewed a draft of a proposed judgment entry and agreed to changes. The draft decree originally provided for an increased amount of "alimony as division of equity" of $521,640 and for termination of "[a]ll payments of alimony" upon Mrs. Hoover's death, remarriage, or cohabitation; the Hoovers, however, at some point deleted the language providing for such termination. J.A. at 144. Mrs. Hoover was still to be granted a lien on the shares as security on payment of that sum, with Mr. Hoover either providing a letter of credit guaranteeing payment or pledging his stockholdings in Stark Ceramics with an escrow agent "until all of the alimony has been paid in full." *Id.* at 145. The decree also stated that Mr. Hoover would provide medical insurance for Mrs. Hoover until her death, remarriage, or cohabitation; the Hoovers did not alter that provision. *Id.* at 145.

The state court entered a final decree on October 19, 1988. The decree did not include a provision for termination of payments of alimony; the security agreement was unchanged. Mr. Hoover was to pay Mrs. Hoover $30,000 within thirty days, and to pay the remainder of the $521,640 in monthly installments of no less than $3000 "until said amount is paid in full." J.A. at 43, 149.

Mrs. Hoover did not include as income on her tax returns the $46,000 Mr. Hoover paid her in 1988 or the $36,200 he paid her in 1989; the Commissioner notified her of a deficiency regarding only the 1988 taxes, which she challenged in the Tax Court. On the other hand, Mr. Hoover claimed deductions for alimony payments for the amounts paid in 1988 and 1989. The Commissioner issued a notice of deficiency to Mr. Hoover disallowing $36,000 of the claimed deduction for 1988 and the entire $36,200 deduction for 1989. Mr. Hoover challenged the deficiencies in the Tax Court, and his case was consolidated with Mrs. Hoover's. The Tax Court held that the payments did not qualify for treatment as alimony as defined by 26 U.S.C. § 71 and therefore were not includible in Mrs. Hoover's income or deductible from Mr. Hoover's. Richard Hoover appeals this decision.

## II. ANALYSIS

This court reviews questions of law, including the Tax Court's interpretation of state law, de novo. *See Conti v. Commissioner*, 39 F.3d 658, 662 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 722 (1995). Findings of fact will stand unless clearly erroneous. *Id.*

### A. 26 U.S.C. § 71

Section 215 of the Tax Code provides for special tax treatment of payments that fall under the definition of "alimony" in § 71. Alimony or separate maintenance payments may be deducted by the payor, but only if they meet the standards set out in the Tax Code. 26 U.S.C. § 215. "Although the property interests of divorcing parties are determined by state law, federal law governs the federal income tax treatment of that property." *Green v. Commissioner*, 855 F.2d 289, 292 (6th Cir.1988). The mere use of the word "alimony" does not affect the tax consequences of payments. *See Sroufe v. Commissioner*, 69 T.C.M. (CCH) 2870, 2874, 1995 WL 350921 (1995) (stating that even though a divorce settlement agreement had used the term "alimony" to characterize payments, the payments could not be deemed alimony under § 71 because nothing in the document suggested that the payor's obligation would terminate upon the payee's death).

Prior to 1984, § 71 required courts to consider a number of factors to determine whether certain transfers of money would be treated as alimony for federal income tax purposes. The Tax Code allowed payments

to qualify as alimony if the payments were periodic and were received "in discharge of ... a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the [divorce] decree or under a written instrument incident to ... divorce or separation." 26 U.S.C. § 71(a)(1) (1982).

Under prior law, payments in discharge of a legal obligation incurred because of the marital relationship "encompass[ed] only payments in the nature of alimony or support, rather than property settlement." *Griffith v. Commissioner*, 749 F.2d 11, 13 (6th Cir.1984); *see also Boucher v. Commissioner*, 710 F.2d 507, 509 (9th Cir.1983); 26 C.F.R. § 1.71–1(b) to (d) (1982). Whether payments represented support or property settlement was a question of intent. *Green v. Commissioner*, 855 F.2d 289, 292 (6th Cir. 1988) (applying pre–1984 law, as 1980 and 1981 taxes were at issue); *Griffith*, 749 F.2d at 13; *see also Boucher*, 710 F.2d at 512. Intent was to be ascertained from the agreement itself and from the surrounding facts and circumstances. *Boucher*, 710 F.2d at 512; *see also Schatten v. United States*, 746 F.2d 319, 322–23 (6th Cir.1984) (listing seven factors identified by the Tax Court as useful in determining the nature of payments: parties' intent; whether valuable property rights were surrendered in exchange for payments; whether payments terminated upon death or remarriage; whether payments were secured; whether payments equaled approximately one-half of marital property; whether the need of the recipient was a factor in determining the amounts of payments; and whether there was a separate provision for support and/or division of property in the document).

As part of the Deficit Reduction Act of 1984, Congress rewrote § 71, replacing the previous vague definitions with four requirements intended to cover payments generally considered to be alimony. *See* Pub.L. No. 98–369 § 422(a), 98 Stat. 494, 795 (codified as amended at 26 U.S.C. § 71(b)); *see also* H.R.Rep. No. 98–432, Part II, 98th Cong., 2d Sess. 1495 (1984) ("The committee bill attempts to define alimony in a way that would conform to general notions of what type of payments constitute alimony as distinguished from property settlements and to prevent the deduction of large, one-time lump-sum property settlements."), *reprinted in* 1984 U.S.C.C.A.N. 697, 1137. Section 71(b)(1) as revised defined "alimony or separate maintenance payment" to mean "any payment in cash if—"

(A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,

(B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,

(C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and

(D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse (and the divorce or separation instrument states that there is no such liability).

26 U.S.C. § 71(b)(1)(A)–(D) (Supp. III 1985).

■ With the revision, Congress specifically intended to eliminate the subjective inquiries into intent and the nature of payments that had plagued the courts in favor of a simpler, more objective test. *See* H.R.Rep. No. 98–432, Part II, at 1495 ("[T]he present law definition of alimony is not sufficiently objective.... [A] uniform Federal standard should be set forth to determine what constitutes alimony for Federal tax purposes."), *reprinted in* 1984 U.S.C.C.A.N. 697, 1137. Although the revised definition did not require courts to determine the nature of payments, Congress was particularly concerned with excluding property settlements from § 215 treatment. *See generally* H.R.Rep. No. 98–432, Part II, at 1495–97; 1984 U.S.C.C.A.N. at 1137–39.

■ The requirement that the obligation to make payments terminate immediately

upon the death of the recipient is central to Congress's intended distinction between support and property settlements. *See* H.R.Rep. No. 98–432, Part II, at 1496; 1984 U.S.C.C.A.N. at 1138 ("In order to prevent the deduction of amounts which are in effect transfers of property unrelated to the support needs of the recipient, the bill provides that a payment qualifies as alimony only if the payor … has no liability to make any such payment for any period following the death of the payee spouse."). *See also* Garrison Lepow, *Nobody Gets Married for the First Time Anymore—A Primer on the Tax Implications of Support Payments in Divorce,* 25 Duq.L.Rev. 43, 53–54 (1986) ("The cash payment of a property settlement is distinguished from a cash payment of alimony under the new statute by the characteristic that alimony payments end on the recipient's death. Whether the cash payment is for the support of the recipient is no longer at issue.") (citing H.R.Rep. No. 98–432).

In the Tax Reform Act of 1986, Congress amended § 71(b)(1)(D) by deleting the parenthetical requirement that the agreement specifically provide for termination upon the death of the payee spouse. Pub.L. No. 99–514, tit. XVIII, subtit. A, § 1843(b), 100 Stat. 2085, 2853 (1986). The requirement that there be no remaining liability after the payee's death survived. The amendment appeared as a "technical correction"; the legislative history explains only that the section was amended "to provide that alimony payments under certain support decrees … will not be disqualified solely because the decree does not specifically state that the payments will terminate at the payee's death." H.R.Rep. No. 99–426, 99th Cong., 1st Sess. 977 (1985); S.Rep. No. 99–313, 99th Cong., 2d Sess. 1000 (1986). Congress made the amendment retroactive to the 1984 revision.

Pub.L. 99–514, tit. XVIII, subtit. A, § 1881, 100 Stat. 2085, 2914 (1986).

▮  The change, which allows state law to "save" alimony arrangements that meet all requirements of § 71(b)(1) except the explicit statement of termination upon death, was apparently intended to mitigate the effects of sloppy lawyering. *See, e.g.,* Marci Kelly, *Calling a Spade a Club: The Failure of Matrimonial Tax Reform,* 44 Tax Law. 787, 799 (1991) ("A 1986 amendment to this provision [section 71(b)(1)(D)'s requirement of specific statement of termination on death] removed this trap for unwary drafters."); C. Lepow, *supra,* at 52 ("Under the 1986 Act, state law can rescue improperly drafted alimony deductions."). In other words, if payments will necessarily terminate upon the payee's death by operation of *state* law, the payments can still qualify under § 71 for special tax treatment pursuant to § 215 despite the parties' failure to specify in the divorce instrument that the payments terminate upon the payee's death.

▮  Although the 1986 amendment injected state law into the § 71(b)(1) inquiry, the purpose behind the 1984 revision still stands. A court determining whether payments qualify as alimony as defined in § 71 will turn to state law only to determine whether state law, by requiring that the payments terminate upon the payee's death, ensures that the payments satisfy § 71(b)(1)(D). Congress clearly did not intend courts to engage in the very sort of subjective inquiry that had prompted the 1984 revision. Therefore, when state family law is ambiguous as to the termination of payments upon the death of the payee, a federal court will not engage in complex, subjective inquiries under state law; rather, the court will read the divorce instrument and make its own determination based on the language of the document.[1]

---

1. The Tax Court has also taken this approach, citing the congressional purpose behind the 1984 act:

> [W]e have applied the language of the agreement itself, avoiding any analysis of the nuances of local law or drawing any inferences as to the intent of the parties. In so doing, we have taken into account the foundation of the 1984 revisions to section 71, namely, the legislative objective to minimize the differences in

Federal tax consequences created by differences in State laws and to establish an objective and uniform Federal standard as to what constitutes alimony.

*Webb v. Commissioner,* 60 T.C.M. (CCH) 1024, 1026, 1990 WL 155448 (1990). *But see Cunningham v. Commissioner,* 68 T.C.M. (CCH) 801, 1994 WL 527538 (1994) (turning to North Carolina contract law and considering extrinsic evidence to determine the intent of the parties

847

The Hoovers' divorce decree did not explicitly provide that the payments would terminate upon Mrs. Hoover's death. Indeed, such termination language was deleted from the final agreement of the Hoovers. We therefore must determine whether the payments would terminate by operation of Ohio law.

## B. Ohio Law

Mr. Hoover argues that "alimony as division of equity" is a term of art under Ohio law, indicating payments that terminate automatically upon the death of the payee spouse. The meaning of "alimony" under then-applicable Ohio law, however, is ambiguous.

At the time of the Hoovers' divorce, the term "alimony" was not clearly defined under Ohio law. The statute providing for alimony did not distinguish between support payments and property settlements. *See* Ohio Rev.Code Ann. § 3105.18 (Anderson 1989) (amended 1991).[2] As a result, Ohio courts used the term "alimony" to indicate both support payments and property settlements. *See Kunkle v. Kunkle,* 51 Ohio St.3d 64, 554 N.E.2d 83, 86 (1990); *Kaechele v. Kaechele,* 35 Ohio St.3d 93, 518 N.E.2d 1197, 1200 (1988); *St. Clair v. St. Clair,* 9 Ohio App.3d 195, 459 N.E.2d 243, 246 (1983); *Vaught v. Vaught,* 2 Ohio App.3d 264, 441 N.E.2d 811, 814 (1981).

The use of the word "alimony" in the Hoovers' divorce decree, therefore, is at best too ambiguous to aid in the § 71 inquiry. *See Yoakum v. Commissioner,* 82 T.C. 128, 136, 1984 WL 15526 (1984) (stating that because "alimony" under Oklahoma law encompassed both support payments and property division, "the Oklahoma trial court's use of the word 'alimony' in this case is not instructive").

If Ohio law did offer any assistance in this court's analysis, however, it probably would not support Mr. Hoover's position that his payment obligation would terminate upon Mrs. Hoover's death. Under Ohio law,

> where an alimony award is for the payment of a sum certain in installments over a definite period of time and is payable *without contingencies,* that amount is part of the property division, as a matter of law, no matter what the parties or the court actually called the award.

*McClusky v. Nelson,* 94 Ohio App.3d 746, 641 N.E.2d 807, 809 (1994) (citing *Vaught,* 441 N.E.2d at 816) (emphasis added); *accord Bean v. Bean,* 14 Ohio App.3d 358, 471 N.E.2d 785, 793 (1983). Payments made pursuant to a division of property do not terminate by operation of Ohio law upon the death of the payee spouse. *See Zimmie v. Zimmie,* 11 Ohio St.3d 94, 464 N.E.2d 142, 146 (1984) ("Plaintiff is legally entitled to that portion of the award which is classified as·a division of marital property. Her eventual remarriage, death, cohabitation or any other contingency is utterly irrelevant to her entitlement to this amount."); *see also McClusky,* 641 N.E.2d at 808· (agreements awarding a definite amount without contingencies "are seen as vesting the obligee's right to receive a sum certain, pursuant to a valid and binding contract between the parties").

The Hoovers' divorce decree ordered Mr. Hoover to pay Mrs. Hoover $521,640 in monthly installments of at least $3000 "until said amount is paid *in full*" (emphasis added). The final decree included no contingencies on Mrs. Hoover's right to the full amount or on Mr. Hoover's obligation to pay it. Furthermore, the decree described the payments as "alimony as division of equity"; while apparently not a term of art in Ohio, this phrase suggests that the payments reflect a division of marital property. Significantly, an Ohio court refused to modify the divorce decree to accelerate the remaining

where state family law did not provide a clear answer).

2. The Ohio statute was revised in 1991 to replace "alimony" with specific definitions of "division of marital property" and "spousal support." Ohio Rev.Code Ann. §§ 3105.171, 3105.18 ( Banks–Baldwin 1992). Whereas the previous statute was silent with regard to termination of

payments upon the payee spouse's death, the revised statute explicitly provides for termination of spousal support payments upon the death of either spouse, unless expressly otherwise provided in the court order containing the award of spousal support. Ohio Rev.Code Ann. §§ 3105.18(B) (Banks–Baldwin 1992).

payments at Mrs. Hoover's request, on the grounds that the court lacked jurisdiction "to modify an award in the nature of a property settlement." J.A. at 194.

Given the ambiguity of the then-applicable state law as to the termination of payments, we hold that Ohio law does not "save" the payments in question for purposes of § 71(b)(1)(D). We therefore must look to the language of the decree itself and make our own determination as to the satisfaction of the § 71(b)(1)(D) requirement.

### C. The Divorce Decree

■ Nothing in the language of the divorce decree itself indicated that the payments to Mrs. Hoover would terminate on her death. In fact, the decree specifically obligated Mr. Hoover to pay her the definite sum of $521,640 in installments "until said amount is paid in full." Such payment was not made contingent on any factor or event. Furthermore, Mrs. Hoover received a lien on Mr. Hoover's shares in Stark Ceramics as security for that payment, with a requirement that Mr. Hoover provide a letter of credit from a bank guaranteeing the payment or that he pledge sufficient stock with an escrow agent, with such pledge to "remain in full force and effect until all of the alimony has been paid in full." We have no reason to conclude that Mr. Hoover's obligation to pay Mrs. Hoover the full amount terminates upon her death.

### III. CONCLUSION

The Hoovers' divorce decree contains no provision for termination of the payments at issue upon Mrs. Hoover's death, and Ohio law applicable at the time of the decree did not clearly provide for such termination. The payments therefore fail to meet the definition of alimony set forth in § 71(b)(1), and cannot be deductible under § 215. For these reasons, we AFFIRM the decision of the Tax Court.