T.C. Memo. 2000-364

UNITED STATES TAX COURT

ALAN ROBERT ZINSMEISTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10782-99.                    Filed November 30, 2000.

Alan Robert Zinsmeister, pro se.

<u>Eric W. Johnson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's 1994, 1995, and 1996 Federal income taxes of $5,344,
$1,969, and $9,748, respectively.

The issue for decision is whether petitioner is entitled to
alimony deductions for his tax years 1994, 1995, and 1996 in
excess of those allowed by respondent.  We hold that he is, to

the extent set forth below.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference.  At the time the petition in this case was filed, petitioner resided in Rochester, Minnesota.

Petitioner and Betty J. Zinsmeister (Betty) were married in 1974.  In 1986, they took out a mortgage (the first mortgage) on their jointly owned residence in the principal amount of $77,900. Petitioner and Betty were jointly liable on the first mortgage note.

Betty initiated divorce proceedings against petitioner in August 1991 and, in October, moved out of the residence.  Two of their three children moved with her, and the third remained with petitioner.

On October 17, 1991, the District Court for the Third Judicial District of Minnesota - Family Division (the State court) issued a temporary order.  Therein, under the heading "Support of the Minor Children", the State court set petitioner's monthly child support obligation at $950.  In addition,

petitioner's monthly spousal support obligation, labeled "Maintenance", was set at $1,150.

In April 1992, petitioner and Betty executed a note and mortgage for the principal amount of $50,000 (the second mortgage). The second mortgage instrument was signed by the petitioner and by Betty. The second mortgage note, however, was signed solely by petitioner.[1] In August, Betty and the two children moved to Woodbury, Minnesota, so that Betty could complete her education at the University of Minnesota.

In December 1992, Betty attempted to move back into the family residence in Rochester. Petitioner obtained an ex parte order awarding him temporary exclusive possession of the residence. In February 1993, however, petitioner and Betty agreed that Betty and all three children would move into the residence and that petitioner would move out.

Betty filed a motion for temporary relief in June 1993. Her affidavit submitted in support of the application for temporary relief stated that the fair market value of the residence was $123,000 and that the total principal of all outstanding mortgages thereon was $100,000. In her motion she sought, among other things, retroactive spousal maintenance and monthly child support of $1,400, to be reduced to $1,200 when their oldest

---

[1]Both the first and second mortgages replaced earlier loans that had been secured by the residence. Those earlier obligations are not involved in this case.

child, Nicholas, graduated high school.  She also sought payments
on the two mortgages and attached a list of miscellaneous
expenses to be incorporated in the order, as follows:

| | |
|---|---:|
| Automobile repair (broken ground effects) | $100 |
| Automobile repair (brakes and struts) | 400 |
| Automobile tires | 400 |
| Veterinarian | 200 |
| Rob's broken trombone | 140 |
| House insurance | 316 |
| Automobile insurance | 373 |
| Real estate taxes | 684 |
| Federal taxes | 556 |
| Graduation expenses | 100 |
| 1992 Income taxes | 120 |
| Melissa's dental work | 60 |
| Contacts | 120 |
| Glasses (needed for summer internship) | 90 |
| Safety shoes (needed for summer internship) | 115 |

In response to her motion, the State court issued a
temporary order, dated July 6, 1993.  The order included the
following provisions:

1.  Petitioner's child support was set at $1,400 per month,
retroactive to January 29, 1993, and continuing through May 1993,
and then at a rate of $1,200 per month thereafter.

2.  "Temporary maintenance" was continued at $1,150 per
month.

3.  Betty was awarded exclusive temporary possession of the
residence.

4.  Petitioner was ordered to "reimburse" Betty $2,414 for

the miscellaneous expenses she requested, with the exception of the taxes. The order listed each of those expenses, including those for the broken trombone, dental work, and graduation.

5. Petitioner was ordered to make payments on the first and second mortgages on the residence and to pay Betty for the real estate taxes she had paid in 1993.

6. Petitioner was ordered to pay $4,000 of Betty's attorney's fees.

As required by the temporary order, petitioner made the monthly payments of $529.96 on the second mortgage for the months between July and December 1993. Petitioner believed that Betty's return to the residence justified his making lower payments, and, therefore, that he did not have to meet the other obligations of the order. On December 20, 1993, the State court issued a contempt order. The order provided, inter alia, that petitioner "shall pay to * * * [Betty] on or before February 1st, 1994, the sum of FIVE HUNDRED DOLLARS ($500) as and for her attorney fees incurred in the hearing on this motion." The State court further provided that Betty "shall have judgment entered in her favor against * * * [petitioner] in the sum of FOURTEEN THOUSAND ONE HUNDRED SEVENTY-THREE AND 62/100TH DOLLARS ($14,173.62), representing arrearages, including attorney's fees unpaid, as heretofore set forth in this order."

In the memorandum that accompanied its order, the State

court explained that the "arrearages" of $14,173.62 consisted of:

1.  Past-due spousal maintenance/support payments of $2,550;

2.  Reimbursement to Betty of three payments she had made on the first mortgage, totaling $2,262.81;

3.  Payments on the first mortgage for the prior months of August, September, and October totaling $2,262.81;

4.  Reimbursement to Betty for real estate taxes on the residence of $684, which she had paid in May 1993;

5.  Reimbursement to Betty of the miscellaneous expenses of $2,414 that she had incurred; and

6.  Betty's attorney's fees of $4,000.

The order further provided that if petitioner did not make the payments ordered, he would be jailed for contempt.  In January 1994, petitioner made a lump-sum payment to Betty of the amount owing, a total of $14,673.  This amount included the newly added reimbursement of an additional $500 for attorney's fees.

On March 18, 1994 the State court entered a "Judgment and Decree", dissolving petitioner's and Betty's marriage.  The decree included the following provisions:

1.  Petitioner's monthly child support was set at $1,500 from April 1994 through June 1996 and $1,250 from July 1996 through June 1998;

2.  Petitioner's monthly payment of "spousal maintenance" was set at $1,400;

3. Betty was awarded the residence subject to a lien in favor of petitioner in the amount of $42,000, with interest at the rate of 6 percent per annum; and

4. Betty was ordered to make payments on the first mortgage, and petitioner was ordered to make payments on the second mortgage.

The decree stated: "Notwithstanding the foregoing, the obligation for maintenance payments shall terminate upon the death of the wife or upon her remarriage."  The decree further provided: "It is specifically understood and agreed that all future maintenance payments to the wife shall be deductible by the husband and taxable to the wife."

The decree continued with a description of Betty's custody rights, of petitioner's visitation rights, and of his support obligations for the three children.  It specified that petitioner was entitled to claim the children as exemptions for State and Federal income tax purposes.

The family residence went to Betty subject to the lien of $42,000 in favor of petitioner payable at the latest by July 1, 1996.  The State court ordered that Betty "immediately seek to re-finance the first mortgage for an amount sufficient to satisfy the first mortgage and husband's lien by seeking a 30 year adjustable rate mortgage."  An immediate refinancing did not occur, however, and the decree's provisions relating to the

payment of the mortgages continued in effect.

Pursuant to the Judgment and Decree, petitioner made the spousal maintenance payments from April 1994 through June 1996. He made the second mortgage payments from April 1994 through August 1996.

Betty graduated from the University of Minnesota and began work in Newton Falls, New York. On July 17, 1996, the State court entered an Amended Judgment and Decree. Therein petitioner's monthly child support payments were reduced from $1,500 to $1,408.75 and his monthly spousal maintenance payments to $500.

In August 1996, petitioner obtained an unsecured line of credit to pay off the second mortgage. Later that month, Betty sold the residence; petitioner received compensation for his $42,000 lien from the proceeds; and Betty relocated to Canton, New York. Petitioner continued to make the $500 spousal maintenance payments at least through the end of 1996, the last of the years at issue.

For Federal income tax purposes, petitioner used the filing status "single" for each of the years at issue. In his Federal income tax return for 1994, petitioner deducted $33,943 as alimony paid. In the notice of deficiency, respondent allowed $17,050 of the alimony deductions and disallowed the balance. The amounts allowed included the court-ordered monthly

maintenance payments of $900 for the first 3 months of 1994[2] and the court-ordered maintenance payments of $1,400 for the last 9 months of 1994. Respondent also allowed petitioner to deduct the $1,750 of past-due spousal support payments which he paid in January 1994 pursuant to the court's contempt order. The disallowed alimony deductions for that year totaled $16,893 and included the balance of the items that petitioner was required to pay by the contempt order, consisting of the following:

1. Past-due first mortgage payments of $4,525,

2. Past-due second mortgage payments of $4,770,

3. Real Estate taxes on the residence of $684,

4. The miscellaneous expenses of $2,414, and

5. Betty's accrued legal expenses of $4,500.

For his taxable year 1995, petitioner deducted, as alimony, a total of $23,160. Of this amount, respondent allowed the deduction of the court-ordered monthly maintenance payments of $16,800. The $6,360 balance, which respondent disallowed, represented the monthly payments on the second mortgage made by petitioner during that year.

For the taxable year 1996, petitioner claimed alimony deductions of $45,020. Respondent allowed $11,400, consisting of

---

[2]In an appendix to his brief, petitioner has explained that he did not deduct the full amount of $1,150 for the first 3 months of 1994 in order to reflect, partially, Betty's payment on the first mortgage for those months.

the court-ordered maintenance payments of $1,400 per month for the first 6 months of that year, plus the reduced amount of $500 per month for the last 6 months.  The disallowed alimony, totaling $33,619.68, consisted of petitioner's 8 months of payments on the second mortgage at $529.96, plus the $29,380 amount petitioner used to pay off the balance of the second mortgage in August 1996.

OPINION

The issue in this case is whether certain payments made by petitioner pursuant to the court orders and decrees in his divorce proceeding are "alimony or separate maintenance payments" as defined in section 71.  If so, they are deductible by petitioner in the year paid.  See secs. 71(a), 215(a).  Alimony does not include any part of a payment which the terms of the divorce instrument fix as a sum payable for the support of the children of the payer spouse.  See sec. 71(c).

Congress amended section 71 in the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 422(a), 98 Stat. 795.  The purpose behind the amendment was to define more precisely the payments that would constitute alimony, deductible by the payor. See H. Rept. 98-432 (part 2) at 1495 (1984), which provides:

> The committee believes that a uniform Federal standard should be set forth to determine what constitutes alimony for Federal tax purposes.  This will make it easier for the Internal Revenue Service, the parties to a divorce, and the courts to apply the rules to the facts in any particular case * * *

Section 71(b)(1), as amended, now defines "alimony or separate maintenance payment" as:

> any payment in cash if--
>
>> (A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,
>>
>> (B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,
>>
>> (C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and
>>
>> (D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

In this case, there is no dispute that the payments at issue satisfy subparagraphs (B) and (C) of section 71(b)(1). The disputed issues are whether the payments at issue satisfy the requirements of subparagraphs (A) and (D) of that section.

Qualification under subparagraph (A) centers on the question of whether the payments at issue were "received by (or on behalf of)" Betty. Petitioner insists that all the disputed payments were made on Betty's behalf. Respondent concedes that petitioner made some of these payments on behalf of Betty, but he counters that the bulk of the payments redounded to petitioner's benefit, and not to Betty's.

We agree with respondent. Initially, respondent correctly concedes that, at least for 1994, many of the payments were made on behalf of Betty. Petitioner's payment of $4,500 of Betty's accrued attorney's fees were clearly made to Betty and on her behalf. See Hopkinson v. Commissioner, T.C. Memo. 1999-154.

Most of the $2,414 in reimbursed miscellaneous expenses were paid to Betty and on her behalf. The language of section 71(c), however, directs that some part of the miscellaneous payments are nondeductible child support. The language of section 71(c) is clear that for payments to be child support, the written divorce instrument by its terms must fix a sum which is payable as child support. We therefore hold that the $140 paid for Rob's broken trombone, the $100 for Nicholas' graduation expenses, and the $60 for Melissa's dental work meet the requirements of section 71(c). By separately identifying those amounts, the State court's order for temporary support fixed those sums as child support under section 71(c), and not alimony. Accordingly, under section 215(a), petitioner may not deduct those amounts.

Different considerations come into play regarding whether petitioner's payment of the mortgages and taxes in 1994 were on Betty's behalf. When a divorce court orders one spouse to make payments on a mortgage for which both spouses are jointly liable, a portion of such payments discharges the legal obligation of the other spouse. In such circumstances the payee spouse has

received income under the general principle of <u>Old Colony Trust</u> <u>Co. v. Commissioner</u>, 279 U.S. 716 (1929) (payment by a third party of a person's legal obligation is taxable income to that person). Accordingly, in such cases, one-half of the mortgage payment is includable in the gross income of the payee spouse and, to the extent it otherwise qualifies as alimony, it is deductible by the payor spouse as alimony. See <u>Taylor v.</u> <u>Commissioner</u>, 45 T.C. 120, 123-124 (1965); <u>Simpson v.</u> <u>Commissioner</u>, T.C. Memo. 1999-251; <u>Zampini v. Commissioner</u>, T.C. Memo. 1991-395; Rev. Rul. 67-420, 1967-2 C.B. 63; see also sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984).

Applying those principles here, we hold that petitioner may deduct as alimony one-half the payments on the first mortgage that he made in 1994 pursuant to the orders of the State court. Petitioner's reimbursement to Betty in 1994 of the 1993 real estate taxes and home insurance premiums produces the same result; one half of those amounts were for the benefit of Betty, who, in 1993, held title jointly with petitioner. Those amounts also constitute alimony paid by petitioner in 1994. See <u>Leventhal v. Commissioner</u>, T.C. Memo. 2000-92.

The other payments at issue in 1994, 1995, and 1996 all consist of petitioner's court-ordered payments upon the second mortgage. Petitioner alone was liable on the note securing the

second mortgage. When petitioner made payments on the second mortgage, the payments discharged petitioner's liabilities, not Betty's.

Moreover, the evidence does not establish that petitioner's payments benefited Betty by increasing the amount she would receive on a subsequent sale of the residence. The record does not disclose the price at which Betty sold the residence. In June 1993, however, Betty's affidavit submitted in support of an application for temporary relief stated that the fair market value of the residence was $123,000 and that the total principal of all outstanding mortgages thereon was $100,000. At trial, petitioner indicated that Betty's calculations were roughly accurate. He suggested that the fair market value was perhaps $130,000 and the total of the mortgages was $110,000. The equity in the residence was at most approximately $30,000. Petitioner, however, had a lien against the residence for $42,000. Taking into account the amount of his lien and the lack of proof as to the sales price of the residence, the record does not establish how much, if any, proceeds from the sale would benefit Betty. See Taylor v. Commissioner, supra at 123-124.

We conclude that petitioner's payments on the second mortgage are not payments of alimony under section 71(b)(1)(A), nor are they deductible as such.

We therefore hold (as respondent in fact concedes) that much

of the $14,673 lump-sum payment by petitioner in January 1994 pursuant to the contempt order was made for the benefit of Betty under subparagraph (A) of section 71(b)(1). The payments for her benefit include the attorney's fees, most of the miscellaneous expenses and one-half the first mortgage, home insurance and real estate taxes paid.[3]

In holding that only some of the payments at issue were made on behalf of Betty, we reject petitioner's contention that he paid all these amounts to Betty or on her behalf. Petitioner contends that all the payments come within the broad statutory definition of "maintenance" under Minnesota law.

> "Maintenance" means an award made in a dissolution or legal separation proceeding of payments from the future income or earnings of one spouse for the support and maintenance of the other. [Minn. Stat. sec. 518.54, subd. 3 (West 1990 & Supp. 1999-2000).]

Petitioner places too much emphasis on the definition of the word "maintenance" in the Minnesota statute. "Although the property interests of divorcing parties are determined by state law, federal law governs the federal income tax treatment of that property." Hoover v. Commissioner, 102 F.3d 842, 845 (6th Cir.

---

[3]Under our holding, some of the lump-sum payments--specifically those amounts representing one-half the payments on the first mortgage, real estate taxes and insurance, plus all the payments on the second mortgage--were for petitioner's benefit. The fact that these latter amounts were "received by" Betty does not convert them into alimony under sec. 71(b)(1)(A). In effect, Betty had only advanced those sums, which petitioner ultimately paid by reimbursing her.

1996)(citing <u>Green v. Commissioner</u>, 855 F.2d 289, 292 (6th Cir. 1988)), affg. T.C. Memo. 1995-183. Accordingly, a State statute's definition of certain items as "maintenance" or "alimony" does not control the Federal taxation of those items when those items fail to satisfy the definition of alimony contained in section 71(b)(1). See <u>Hoover v. Commissioner</u>, <u>supra</u>; <u>Baker v. Commissioner</u>, T.C. Memo. 2000-164. Here, as we have held, Federal law determines, for income tax purposes, the amount of the payments that were paid on Betty's behalf and thus constitute alimony within the meaning of section 71(b)(1).

We also reaffirm our ruling at trial in which we rejected, as irrelevant, evidence of the parties' intent as to the nature of the payments at issue. The statutory definition of alimony in section 71(b)(1) does not include a consideration of the parties' intent. The omission is deliberate. As the Court of Appeals for the Sixth Circuit has noted, in amending section 71(b), Congress sought to eliminate "subjective inquiries into intent and the nature of payments that had plagued the courts in favor of a simpler, more objective test". <u>Hoover v. Commissioner</u>, <u>supra</u>.[4]

Nor can we accept petitioner's arguments specifically addressed to the "alimony" status of his payments on the second

---

[4]In this regard, petitioner's reliance upon cases such as <u>Wells v. Commissioner</u>, T.C. Memo. 1998-2, is misplaced. The documents in this case do not present the type of inconsistencies or ambiguities that permitted the introduction of extrinsic evidence as to intent in <u>Wells</u>.

mortgage. Petitioner argues that, pursuant to the divorce decree, his payments on the second mortgage note were made on a house he no longer owned. Thus, he concludes, his payments on the second mortgage were made on Betty's behalf. Petitioner's argument ignores his failure to establish that Betty would benefit economically from his payments on the second mortgage. See Taylor v. Commissioner, supra. Accordingly, those payments would not be made on behalf of Betty and would not meet the definition of alimony in section 71(b)(1).

We recognize that, if petitioner had not made the second mortgage payments, the resulting foreclosure might have interfered with Betty's rent-free use of the house. This possibility, however, does not transform petitioner's nondeductible payment on his personal debt into deductible alimony. See Bradley v. Commissioner, 30 T.C. 701, 707 (1958); cf. sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984).

As we have held, some of the payments in issue--the attorney's fees, most of the miscellaneous expenses and one-half the first mortgage, home insurance and real estate taxes--were payments on behalf of Betty and thus satisfy the requirements of section 71(b)(1)(A).

As to these particular payments, however, respondent contends that they fail to qualify as alimony on the additional

ground that they do not satisfy the requirement that "there is no liability to make any such payment for any period after the death of the payee spouse".  Sec. 71(b)(1)(D).  Accordingly, respondent concludes, these payments are not alimony.  We agree with respondent insofar as the attorney's fees are concerned; otherwise, we disagree.

In the Deficit Reduction Act of 1984, Congress imposed the requirement that alimony payments must relate solely to periods before the death of the payee.  See section 71(b)(1)(D), as amended by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 422(a), 98 Stat. 795.  Under that Act, the provision that alimony payments terminate with the payee's death was required to be set forth in the divorce or separation agreement.  In 1986, however, Congress removed the requirement that the termination-at-death provision be specifically set forth in the divorce or separation agreement.  See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1843(b), 100 Stat. 2853.  Thus, payments now qualify as long as termination would occur automatically under State law.

In section 71(b)(1)(D), Congress recognized that payments would operate to support and maintain the payee only if they related to periods before her death, and that payments for periods after her death obviously would not provide such support. The relevant legislative history explains:

> In order to prevent the deduction of amounts which are in effect transfers of property unrelated to the

support needs of the recipient, the bill provides that a payment qualifies as alimony only if the payor (or any person making a payment on behalf of the payor) has no liability to make any such payment for any period following the death of the payee spouse. [H. Rept. 98-432 (part 2), at 1496 (1984).]

Under Minnesota law, temporary orders in a divorce proceeding terminate when the underlying proceeding is consummated by dismissal or otherwise. See Minn. Stat. 518.131, subd. 5 (2000); Richardson v. Richardson, 15 N.W.2d 127 (Minn. 1944). Similarly, an order of civil contempt for failure to obey an order pending a final divorce decree loses its "force and life" with a judgment of dismissal. In re Fanning, 41 N.W. 1074 (Minn. 1889). Minnesota law also provides that a suit for a divorce abates when either spouse has died. See Tikalsky v. Tikalsky, 208 N.W. 180 (Minn. 1926).

Minnesota law, however, expressly provides that an award of attorney's fees, even if made in a temporary order, survives the underlying action for a divorce. The relevant statute provides:

An award of attorney's fees made by the court during the pendency of the proceeding or in the final judgment survives the proceeding and if not paid by the party directed to pay the same may be enforced as above provided or by a separate civil action brought in the attorney's own name. If the proceeding is dismissed or abandoned prior to determination and award of attorney's fees, the court may nevertheless award attorney's fees upon the attorney's motion. The award shall also survive the proceeding and may be enforced in the same manner as last above provided. [Minn. Stat. sec. 518.14 subd. 1 (West 1990 & Supp. 1999-2000).]

Here, the payments which remain at issue were all originally

ordered to be paid in the temporary order of June 1993 and again in the contempt order of December 1993. With the exception of the attorney's fees, Minnesota law provides that the effect of such orders would have ended with Betty's death, which would have terminated her divorce action. It follows that, as to those payments, petitioner had no liability for any period following the death of the payee. Therefore, those payments other than the attorney's fees constitute alimony under section 71(b)(1)(D).

Respondent's arguments to the contrary are misplaced. Initially, respondent correctly acknowledges that, under Minnesota law, the obligation to pay "maintenance" terminates with the death of the payee spouse. See Minn. Stat. sec. 518.64, subd. 3 (West 1990 & Supp. 1999-2000):

> Unless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance.

In the notice of deficiency, respondent has accordingly allowed, as alimony deductions, the regular periodic payments of spousal support that the State court specifically identified as "maintenance".

Respondent also points out, however, that when the Minnesota court ordered the payment of arrearages, it failed to designate some of them as "maintenance" or to specify that they would end with Betty's death. Many of the payments that we have found were

made on behalf of Betty--specifically the attorney's fees, miscellaneous expenses, mortgage payments, home insurance, and real estate taxes--lacked that label.  Respondent accordingly urges that neither the pertinent State statutes nor the State court's orders provide that the payments in dispute would terminate on the death of the payee spouse.  Thus, respondent concludes, these specific payments do not meet the requirement imposed by section 71(b)(1)(D).

Respondent has placed too much emphasis on the State court's failure to describe the payments as "maintenance".  Respondent's argument overlooks consideration that, whatever they are called, these payments (with the exception of the attorney's fees) will end with the death of the payee spouse.  They thus satisfy the requirement to be treated as alimony contained in section 71(b)(1)(D).

We recognize that, if Betty had died while the temporary order was in effect, petitioner might have remained contractually liable for some of the payments, such as those on the mortgage.  Such an event, however, would have transformed the portion of the payments made "on behalf of" Betty into nondeductible personal expenses of petitioner alone, pursuant to section 262.  Thus, their status as alimony payments under section 71(b)(1) would have terminated with Betty's death.  See Israel v. Commissioner, T.C. Memo. 1995-500; cf. Cologne v. Commissioner, T.C. Memo.

1999-102.

We therefore conclude that some of the payments at issue meet the requirements of alimony under section 71(b)(1) and qualify as deductions under section 215.  These payments total $4,560.81; they consist of $2,262.81 (one-half of 6 months' first mortgage payments), plus $342 (one-half of the 1993 real estate taxes), plus $1,957 (reimbursed miscellaneous expenses for spousal maintenance, less specified items of child support and one-half the home insurance payment).

To reflect the foregoing,

Decision will be entered

under Rule 155.