# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-2209
_____

Andrew J. Redleaf

*Appellant*

v.

Commissioner of Internal Revenue

*Appellee*

_____

No. 21-2224
_____

Elizabeth G. Redleaf

*Appellee*

v.

Commissioner of Internal Revenue

*Appellant*

_____

Appeals from The United States Tax Court
_____

Submitted: February 15, 2022
Filed: August 5, 2022

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

Andrew Redleaf made deferred cash payments to his ex-wife Elizabeth pursuant to a marriage termination agreement providing that Elizabeth "waives any right to . . . permanent spousal maintenance." Were those payments nonetheless "spousal maintenance" payments under Minn. Stat. § 518.552? We conclude the answer is clearly no and therefore affirm the decision of the United States Tax Court denying Andrew deductions under now-repealed alimony provisions of the Internal Revenue Code for $51M in cash payments he made to Elizabeth during his 2012 and 2013 federal income tax years.

**I.**

Andrew and Elizabeth[1] married in 1984. Andrew initiated divorce proceedings in Hennepin County District Court in 2007. The marital properties were substantial. On February 4, 2008, after months of contentious litigation, Andrew and Elizabeth, represented by counsel, entered into and submitted to the District Court a Marital Termination Agreement ("MTA") to resolve remaining financial issues. Two weeks later, the Court entered its Judgment and Decree dissolving the marriage under Minnesota law, approving the MTA, and incorporating many provisions of the MTA into the decree. The MTA provides that, if it is approved and the marriage dissolved, all terms "shall be made by reference a part of any decree issued."

_____

[1]To avoid confusion, we will refer to Andrew and Elizabeth Redleaf by their first names.

This dispute concerns deferred payments Andrew agreed to make to Elizabeth in 2012 and 2013. Andrew filed federal income tax returns claiming these were deductible "Alimony and separate maintenance payments" under 26 U.S.C. §§ 61(a)(8), 71(a)-(b), and 215(a). Elizabeth filed returns claiming the payments were nontaxable transfers of property incident to divorce. See 26 U.S.C. § 1041(a)(2), (c)(2). The Commissioner issued separate deficiency notices to Andrew, explaining he had not shown the payments "qualified as alimony," and to Elizabeth, explaining payments to her "are includable in taxable income as alimony income." Both petitioned the United States Tax Court for redetermination of their federal tax liabilities. Before the Tax Court, the Commissioner argued the payments were not alimony payments deductible by Andrew nor taxable income to Elizabeth, and therefore Elizabeth was entitled to summary judgment reversing this deficiency.

The Tax Court consolidated the cases and, agreeing with the Commissioner, granted summary judgment in favor of Elizabeth. Focusing on two of the four criteria that defined deductible alimony payments in § 71(b)(1), the Tax Court concluded (i) that Andrew's obligation to make payments would have continued if Elizabeth had died before the final payment was due, 26 U.S.C. § 71(b)(1)(D); and (ii) that the MTA *designated* the payments as not includable in Elizabeth's gross income and not deductible by Andrew, § 71(b)(1)(B). Later, based on the parties' agreement that the two decisions need to be consistent, the Tax Court granted summary judgment in favor of the Commissioner in Andrew's case.

In Case No. 21-2209, Andrew appeals the Tax Court decision disallowing him alimony-based deductions. The Commissioner and Elizabeth defend the Tax Court's decision. In Case No. 21-2224, the Commissioner protectively appeals the grant of summary judgment in favor of Elizabeth. Reviewing the Tax Court's interpretation of the governing statutes *de novo*, we affirm both decisions. See Nelson v. Comm'r, 568 F.3d 662, 664 (8th Cir. 2009) (standard of review).

**II.**

Former Section 215 of the Internal Revenue Code granted a deduction for payments constituting "alimony or separate maintenance payments" under 26 U.S.C. § 71.[2]  In the Deficit Reduction Act of 1984, Congress revised Section 71 to "eliminate the subjective inquiries into intent and the nature of payments that had plagued the courts in favor of a simpler, more objective test."  Hoover v. Comm'r, 102 F.3d 842, 845 (6th Cir. 1996).  Under revised § 71(b)(1), an alimony or separate maintenance payment deductible under § 215(a) means "any payment in cash if --

> (A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,
> (B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,
> (C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and
> (D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse."

In making the statute more objective, Congress adopted criteria that would distinguish deductible alimony payments from property settlements:

> In order to prevent the deduction of amounts which are in effect transfers of property unrelated to the support needs of the recipient, the

---

[2]Congress repealed this deduction as part of the Tax Cuts and Jobs Act of 2017, Pub. L. 115-97, 131 Stat. 2054, 2089 (2017).  The 1984 version of § 71, as corrected in 1986, applies in this case.

bill provides that a payment qualifies as alimony only if the payor . . . has no liability to make any such payment for any period following the death of the payee spouse.

H.R. Rep. No. 98-432, Part II at 1496, 1984-3 U.S.C.C.A.N. 697, 1138. Thus, the survival criterion in § 71(b)(1)(D), the primary basis for the Tax Court's decision in this case, and the only provision we need review, "is central to Congress's intended distinction between support and property settlements." Hoover, 102 F.3d at 845-46.

In general, "the property interests of divorcing parties are determined by state law [but] federal law governs the federal income tax treatment of that property." Id. at 844 (quotation omitted). Thus, the court in Hoover paid close attention to the role to be played by state law in applying § 71(b)(1)(D). The Tax Court has summarized the test adopted in Hoover and followed by other courts:

To determine whether a payor has liability to continue payments after the payee's death, we apply the following sequential approach: (1) the Court first looks for an unambiguous termination provision in the applicable divorce instrument; (2) if there is no unambiguous termination provision, then the Court looks to whether payments would terminate at the payee's death by operation of State law; and (3) if State law is ambiguous as to the termination of payments upon the death of the payee, the Court will look solely to the divorce instrument to determine whether the payments would terminate at the payee's death."

Logue v. Comm'r, 114 T.C.M. (CCH) 599 (2017), citing Hoover, 102 F.3d at 847-48.

**III.**

In the MTA, Andrew and Elizabeth stipulated that Elizabeth would receive both family homes -- their Minnesota homestead and a home in Telluride, Colorado -- most furnishings and valuable artwork in the homes, and four of their five vehicles.

Andrew received a piano, at least three pieces of art, his personal effects, the fifth vehicle, and -- most importantly in this case -- his entire 84.5% ownership interest in Whitebox Advisors, LLC ("Whitebox"), a hedge fund asset management firm Andrew founded in 1999. Andrew proposed this property settlement on the day that business-valuation appraisers were scheduled to meet with Andrew and Whitebox employees to prepare a business valuation of this principal marital asset.

To reflect Elizabeth's interest in the Whitebox marital asset,[3] Part VI, Paragraph 23 of the MTA, entitled "Property Settlement," provided that Andrew would pay Elizabeth some $140 million over the next five years:

A. On or before February 15, 2008, [Andrew] shall pay to [Elizabeth], as a cash property settlement, $750,000;

B. On or before February 15, 2008, [Andrew] shall pay to [Elizabeth], as a cash property settlement, $20,000,000;

C. Commencing March 15, 2008, [Andrew] shall pay to [Elizabeth] $1,500,000 per month . . . for sixty (60) months; and

D. On March 15, 2013, [Andrew] shall pay to [Elizabeth] $30,000,000.

Andrew personally secured the property settlement and agreed to accelerate payments if there was a "Change of Control of Whitebox" before February 2, 2013. The MTA also contained additional provisions relevant to this appeal in Parts V and VI:

---

[3]A provision in Minn. Stat. Ch. 518 provides that each spouse "shall be deemed to have a common ownership" in property acquired by either spouse subsequent to the marriage. The interest vests on entry of a marriage dissolution decree, with the extent of the interest to be determined by the court. Minn. Stat. § 518.003, Subd. 3b.

Paragraph 15.b. provided that Elizabeth "is not employed outside the home . . . [and she] has adequate income and financial resources from the property settlement to meet her needs and the needs of the minor child when she is in her care."

Paragraph 17 provided that each party "is capable of self support and . . . waives any right to receive temporary and/or permanent spousal maintenance . . . now or in the future. . . .  The consideration for said waivers is the property division as herein described, the award of income-producing assets, and both party's ability to provide adequate self support after considering the standard of living established during the marriage . . . . [T]he parties intend to divest the Court of jurisdiction to award spousal maintenance to either party now or in the future."

Paragraph 35 provided:  "The parties have entered into the division of property . . . intending it to be an equitable division of marital property, which they believe to be co-owned by virtue of the actual contributions of each party to the acquisition of the whole and by virtue of the co-ownership property interest granted to spouses by law. Both parties accordingly agree not to take any position . . . which is inconsistent with the concept of an equitable division of jointly owned property with regard to any filing, audit, or report required by any state or federal taxing authority."

Part VI listed terms that "shall be incorporated into the Judgment and Decree," including in addition to the above-quoted Property Settlement:

11. Spousal Maintenance. . . .

- B.    [Andrew] shall pay no temporary or permanent spousal maintenance to [Elizabeth], [Elizabeth] having absolutely waived any right to have [Andrew] pay temporary or permanent spousal maintenance now or in the future.
- C.    The Court is divested of, and shall have no jurisdiction, over spousal maintenance, therefore prohibiting the Court from modifying the [parties'] agreement at a later [date], as

> this right was waived pursuant to Minn. Stat. § 518.552, Subd. 5, and <u>Karon v. Karon</u>, 435 N.W.2d 501 (1989).

> 20. <u>Business Interests.</u> [Andrew] is awarded all right, title, interest and equity in and to Whitebox . . . [Elizabeth] waives all right, title and interest she may have in [Andrew's] business interests, including Whitebox . . . .

Rather surprisingly, given the overall sophistication of the document and the substantial state court litigation between the parties that followed, the MTA contained no provision clarifying (designating) that the payments in question were *not* includable in Elizabeth's gross income and allowable as a deduction to Andrew, § 71(b)(1)(B)[4]; and no provision unambiguously stating that Andrew had no liability to make payments for a period after Elizabeth's death, § 71(b)(1)(D).

Approximately eight months after the Hennepin County District Court approved the MTA and entered the divorce decree, Andrew advised Elizabeth that the 2008 financial crisis negatively impacted Whitebox and he could not continue to make the $1.5 million monthly payments. Elizabeth declined to reopen the MTA. Andrew stopped making payments in January 2009 and moved to "reopen[] the property division" in the decree on the ground that it was no longer equitable. <u>See</u> Minn. Stat. § 518.145, Subd. 2(5). The District Court denied the motion because Andrew failed to present an unforeseen development, only that his "prediction about the market proved inaccurate." <u>Redleaf v. Redleaf</u>, No. 27 FA 07 3480 (D. Ct. 2009), citing <u>Thompson v. Thompson</u>, 739 N.W.2d 424, 430-31 (Minn. Ct. App. 2007). One year later, the District Court for the same reason denied Andrew's renewed motion

---

[4]For cases discussing the meaning of the word "designate," <u>see</u> <u>Richardson v. Comm'r</u>, 125 F.3d 551, 556 (7th Cir. 1997) ("make known directly"), and <u>Estate of Goldman v. Comm'r</u>, 112 T.C. 317, 323 (1999) (document "need not mimic" the statutory language), <u>aff'd sub nom.</u> <u>Schutter v. Comm'r</u>, 242 F.3d 390 (10th Cir. 2000) (table).

to amend the decree, observing, "This Court is at a loss . . . as to how one can construe the 'property settlement' to be 'spousal maintenance' given the clear language in paragraph seventeen (17) of the [MTA] and paragraph nineteen (19) [of the decree]." Redleaf v. Redleaf, No. 27 FA 07 3480, Order at 4 (D. Ct. June 22, 2010). The Minnesota Court of Appeals affirmed. Nos. A09-1805, A09-2360, A10-10, 2010 WL 3543458 (Minn. Ct. App. Sept. 14, 2010). The Court of Appeals observed that:

> [Elizabeth] was entitled to one-half of the value of Whitebox. But in lieu of establishing that value based on an appraisal of the business, she agreed to [Andrew's] proposed cash settlement without any reference to Whitebox. Id. at *4.

## IV. The Section § 71(b)(1)(D) Issue

The Tax Court concluded, and the parties agree, that the MTA "does not plainly state" whether the payments at issue would have survived Elizabeth's death. Therefore, applying the sequential analysis adopted in Hoover, we turn to Minnesota state law. Under Minnesota's Marriage Dissolution law, "'Maintenance' means an award made in a dissolution . . . proceeding of payments from the future income or earnings of one spouse for the support and maintenance of the other." Minn. Stat. § 518.003, Subd. 3a. The statute further provides that, "[u]nless otherwise agreed in writing or expressly provided in the degree, the obligation to pay future maintenance is terminated upon the death of either party . . . ." Minn. Stat. § 518A.39, Subd. 3. Therefore, Andrew argues, Minnesota law unambiguously provides that the payments at issue would terminate upon Elizabeth's death, satisfying the fourth criteria of deductible alimony payments, § 71(b)(1)(D). We disagree.

The flaw in Andrew's contention is its assumption that the MTA was a "maintenance order" under Chapter 518. In a Minnesota dissolution proceeding, the Hennepin Country District Court could grant a maintenance order if Elizabeth:

(a) lacks sufficient property, including marital property apportioned to the spouse, to provide for reasonable needs of the spouse considering the standard of living established during the marriage . . . or

(b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances . . . .

Minn. Stat. § 518.552, Subd. 1. Conceding as he must that Elizabeth could not satisfy condition (a), Andrew argues that she satisfied condition (b) because "tens of millions of dollars" were needed to self-support her extravagant international lifestyle, established during the marriage and further enhanced in the years after their divorce.

This argument simply ignores controlling Supreme Court of Minnesota precedent. In Lyon v. Lyon, 439 N.W.2d 18, 22 (Minn. 1989), decided well before Andrew and Elizabeth entered into the MTA, the Court held:

Because maintenance is awarded to meet need, maintenance depends on a showing of need. [Citation omitted.] This dependence on need is implicit in the second threshold requirement dealing with unemployability of the spouse seeking maintenance. Indeed, what is implicit becomes explicit when the statute goes on to state that, in awarding maintenance, the factors to be considered include 'the financial resources of the party seeking maintenance including marital property apportioned to the party, and the party's ability to meet needs independently' [citing § 518.552, Subd. 2(a)].

. . . . Here . . . there has been an equal division of a substantial marital estate amassed over 32 years which enables the wife to continue her established high standard of living.

We hold, therefore, that the award of spousal maintenance must be reversed.

-10-

More recently, the Court has reaffirmed that, "*[o]nce* a spouse has made a sufficient showing of need, *only then* will a court consider the amount and duration of a maintenance award . . . ." Curtis v. Curtis, 887 N.W.2d 249, 252 (Minn. 2016) (emphasis added).

We therefore conclude that Minnesota law unambiguously establishes that the MTA was not a spousal maintenance agreement. Rather, it was a contractual division of marital property. Contractual obligations under a divorce agreement fall under the general rule that causes of action survive their personal representatives. Minn. Stat. § 573.01. That being so, Minnesota law unambiguously provides that the payments in question were not deductible because Andrew's liability to make the payments would survive Elizabeth's death. This is consistent with the stated purpose of § 71(b)(1)(D) "to prevent the deduction of amounts which are in effect transfers of property *unrelated to the support needs of the recipient*" (emphasis added).

As the discussion of Ohio law in Hoover illustrates, state law can be ambiguous in its use of the word "alimony," which can then require a closer look at the decree to decide the § 71(b)(1)(D) issue. 102 F.3d at 847-48. That is not a problem here because, before the MTA was signed and the decree entered in 2008, the Minnesota Legislature eliminated former statutory references to "alimony," meaning that a "maintenance" order under Chapter 518 was the only way to satisfy the "alimony or separate maintenance payments" requirement of 26 U.S.C. § 215(a). Moreover, if Minnesota law is ambiguous in this regard, the third step in the sequential Hoover analysis would bring into play the many above-quoted MTA provisions establishing that it was a property settlement, not a spousal maintenance agreement, including Elizabeth's waiver of "any right to receive spousal maintenance now or in the future," provisions that prompted the Hennepin County District Court to be "at a loss . . . as to how one can construe this 'property settlement' to be 'spousal maintenance,'" an observation consistent with the Supreme Court of Minnesota's decision in Lyon.

-11-

## V. Conclusion

The Tax Court's Order and Decision in Docket No. 10526-16 dated February 26, 2021, and its Order in Docket No. 13901-17 dated November 17, 2020, are affirmed.

_____