T.C. Memo. 2012-348

UNITED STATES TAX COURT

ATEF SA'D, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19061-06.                     Filed December 18, 2012.

<u>Harvey J. Waller</u>, for petitioner.

<u>Julie A. Jebe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency of $101,836 and an

accuracy-related penalty under section 6662(a) of $20,367 with respect to

petitioner's Federal income tax for the 2001 taxable year.[1]

---

[1]All section references are to the Internal Revenue Code of 1986, as in effect
for the year at issue.  All dollar amounts are rounded to the nearest dollar.

[*2]   Following concessions by both parties,[2] the issues for decision are whether petitioner is allowed to deduct the following payments that he made from the bank accounts of his wholly owned subchapter S corporation (S corporation):  (1) a lump-sum payment of $160,000 to his former spouse; (2) periodic payments to his former spouse totaling $61,574; (3) a payment of $69,000 made to attorneys who represented his former spouse in their divorce action; (4) payments totaling $5,384 that he contends were for medical expenses of his children; and (5) whether petitioner is liable for an accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  Petitioner resided in Illinois at the time he filed his petition.

During 2001 petitioner was the president and sole shareholder of Action Mortgage, Inc. (Action Mortgage), an S corporation.  Petitioner was married in 1984 to Mildred Sa'd (Mrs. Sa'd).  In 1999 Mrs. Sa'd commenced a divorce action

---

[2]Petitioner concedes that various deductions were erroneously claimed by his S corporation for the year at issue but contends that he is entitled to deduct those amounts either as alimony or under other sections.  Respondent concedes that the amount of the S corporation's medical expenses disallowed in the notice of deficiency ($5,834) was erroneous in that only $5,384 of such expenses was claimed.  Respondent accordingly concedes that the disallowance was overstated by $450.  The notice of deficiency also made certain computational adjustments to the amounts claimed on petitioner's return for itemized deductions and the personal exemption.

[*3] in an Illinois State court against petitioner. On December 20, 1999, Mrs. Sa'd filed an emergency petition for a temporary restraining order in the divorce action. Therein, she sought, inter alia, that petitioner be enjoined from making withdrawals from Action Mortgage's bank accounts, that her name be added to the accounts, and that her signature be required for any withdrawals from the accounts, including withdrawals in the ordinary course of business. In an attached affidavit Mrs. Sa'd affirmed that Action Mortgage had been "started with marital funds" and that while she had worked there once, she had not done so, nor been allowed on the premises by petitioner, for the past three years.[3]

The State court temporarily prohibited all withdrawals by petitioner, but on December 28, 1999, the court issued an order allowing petitioner to make withdrawals in the ordinary conduct of Action Mortgage's business provided Mrs. Sa'd was notified daily[4] and allowing each spouse to make withdrawals of $5,000 per month from the Action Mortgage bank accounts to cover his or her expenses. On November 13, 2000, upon Mrs. Sa'd's motion, the State court issued an order

---

[3]Mrs. Sa'd also affirmed that her name had been on the Action Mortgage bank accounts and that petitioner had assumed control of the accounts and removed her name from them.

[4]The State court did not grant Mrs. Sa'd's request that her name be placed on the Action Mortgage bank accounts or that her signature be required on checks drawn on the accounts.

**[*4]** (interim order) which modified the monthly amounts so that "each party shall be entitled to receive $6,000 from the corporate account of Action Mortgage Inc. for support without prejudice to a full hearing." The interim order made no designation with respect to the income tax treatment of the payments. Mrs. Sa'd received $6,000 each month from Action Mortgage's bank accounts for the first 10 months of 2001 under the terms of the interim order. Petitioner and Mrs. Sa'd no longer lived together at the time.

On November 6, 2001, the State court entered a divorce judgment. The judgment incorporated a marital settlement agreement executed by petitioner and Mrs. Sa'd on November 1, 2001. Under article III of the marital settlement agreement, entitled "Unallocated Maintenance and Support", petitioner agreed to pay Mrs. Sa'd $6,000 per month "for her unallocated maintenance and the support of the parties' minor children" beginning November 1, 2001. Petitioner's obligation was to terminate after five years or upon the death of either petitioner or Mrs. Sa'd. The agreement also provided that the amounts paid were to be includible in the gross income of Mrs. Sa'd and deductible from the gross income of petitioner.

Article V of the agreement, entitled "Medical and Related Expenses", required petitioner and Mrs. Sa'd each to pay half of the uninsured medical

[*5] expenses of each of the couple's children until the child completed or discontinued a college, university, or vocational school education, or until the child's 23d birthday, whichever came first.

Article X, entitled "Action Mortgage, Inc.", provided that petitioner would "retain as his sole and exclusive property, free of any claim by * * * [Mrs. Sa'd], all right, title and interest in and to Action Mortgage, Inc."  Next, article XI, entitled "Bank Accounts, Stocks, Bonds & Investment Funds", provided in section 1 that "[u]pon the entry of a Judgment for Dissolution of Marriage", petitioner was to pay Mrs. Sa'd "a lump sum of one hundred sixty thousand dollars" and in section 2 that all bank accounts in either party's name or under his or her control would be retained by that party.  In contrast to the $6,000 per month payments for "unallocated maintenance", there was no provision in the agreement specifically providing for the termination of the obligation to make the lump-sum payment upon the death of Mrs. Sa'd.[5]

---

[5]Article XI read in full:

BANK ACCOUNTS, STOCKS, BONDS & INVESTMENT FUNDS

XI.1.  Upon the entry of a Judgment for Dissolution of Marriage in this cause now pending, ATEF shall pay to MILDRED a lump sum of one hundred sixty thousand dollars ($160,000).
XI.2.  All bank accounts and funds contained in such accounts, stocks, bonds & investment funds, now titled in the parties' respective individual

(continued...)

[*6] The agreement also provided that each party "will assume full responsibility for payment of his and her own, individual attorneys' fees and costs incurred in this action and further, each party will hold the other harmless from any liability in connection therewith."

Petitioner and Mrs. Sa'd were present at a State court hearing on November 1, 2001, concerning the terms of the marital settlement agreement and other aspects of their divorce. Petitioner's attorney advised the court that he had explained to his client that the $6,000 monthly payments characterized in the agreement as unallocated maintenance and child support would be deductible by him. Petitioner's attorney did not discuss the tax impact of any other aspect of the agreement at the hearing. Mrs. Sa'd's attorney described the $160,000 lump-sum payment as follows: "Mr. Sa'd would retain his business, Action Mortgage, along with the remaining cash in the company after paying Mrs. Sa'd one hundred sixty thousand dollars." Petitioner stated at the hearing that he understood the terms of the agreement.

---

[5](...continued)
names, or any account under their dominion and control, shall be the sole and exclusive property of said party. The parties hereto further mutually agree to waive and release all their right, title and interest in and to the bank accounts, stocks, bonds & investment funds to be retained by the other party pursuant to the terms of this provision.

[*7]   For the 2001 taxable year petitioner timely filed a Form 1040, U.S. Individual Income Tax Return, for himself and a Form 1120S, U.S. Income Tax Return for an S Corporation, for Action Mortgage.  Petitioner did not claim any dependents on his individual return.  The Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., attached to the Form 1120S reported petitioner as owning 100% of the stock of Action Mortgage throughout 2001.  The Form 1120S claimed deductions of $5,384 for "Medical Expense", $127,794 for "Consultation expenses", and $933,652 for "Commissions".  The amount deducted for medical expenses was attributable to payments that petitioner contends were made for medical care for his children.  The consultation expenses deducted included $69,000 paid to Mrs. Sa'd's attorneys for their services in connection with the divorce proceeding.  The amounts deducted as commissions included $73,574 in monthly payments claimed as paid to Mrs. Sa'd pursuant to the interim order and divorce judgment and the $160,000 lump-sum payment.

Respondent issued a notice of deficiency determining that petitioner's distributable share of Action Mortgage's ordinary income required adjustment because the following deductions claimed by Action Mortgage were not allowable: (1) $5,384 for medical expenses; (2) $69,000 for consultation expenses; and (3) $233,574 for commissions expenses.  The adjustments increased petitioner's

**[*8]** distributive share from a loss of $37,373 to income of $271,035. As stated, the notice also determined an accuracy-related penalty.

On March 8, 2010, in response to a motion by petitioner for "clarification of previous orders", the State court issued an order in petitioner's divorce case stating that the $6,000 per month that Mrs. Sa'd received from Action Mortgage pursuant to the interim order and the $160,000 payment to Mrs. Sa'd required in the divorce judgment were "unallocated support payments" from petitioner to Mrs. Sa'd. The order stated that the issue concerning the $69,000 that petitioner paid to Mrs. Sa'd's attorneys "is not ruled upon by this Court."

OPINION

Petitioner has conceded that the deductions at issue were improperly claimed as expenses of Action Mortgage on its corporate return, but he contends that he is entitled to deduct them on his personal return as alimony or pursuant to other Internal Revenue Code provisions.[6]

---

[6]Respondent notes on brief that while Action Mortgage's payment of petitioner's personal expenses should have resulted in a constructive dividend to petitioner, the constructive dividend would reduce the amount of passthrough income to petitioner from Action Mortgage by a corresponding amount. Thus, respondent concedes, the inclusion of the constructive dividend arising from the amounts in dispute would not have affected the deficiency determined.

**[*9]** <u>Overview</u>

Alimony payments are deductible by the payor. Sec. 215(a). Payments that qualify as deductible are those defined as alimony in section 71(b) and thus includible in the income of the payee. Sec. 215(b). To qualify as alimony, the payments must be in cash and (1) made pursuant to a written divorce or separation instrument,[7] (2) not specifically designated in that instrument as a payment not includible in gross income or allowable as a deduction, (3) made at a time when the payor and payee are not members of the same household, and (4) not made pursuant to a liability that would exist for any period after the death of the payee spouse. Sec. 71(b)(1)(A)-(D). The foregoing requirements are conjunctive; a payment is deductible alimony only if all four requirements of section 71(b)(1) are satisfied. <u>See</u> <u>Jaffe v. Commissioner</u>, T.C. Memo. 1999-196. A payment satisfying the preceding criteria is nevertheless treated as child support (and not deductible) to the extent that the payment is specifically fixed in the divorce instrument as an amount for the support of the payor's children or subject to reduction as a result of (or at a time clearly associated with) some contingency related to a child of the payor spouse. Sec. 71(c).

---

[7]A "divorce or separation instrument" for this purpose includes an order of separate maintenance. Sec. 71(b)(2); sec. 1.71-1(b), Income Tax Regs.

**[\*10]** <u>Lump-Sum Payment</u>

Respondent contends that the $160,000 lump-sum payment petitioner made pursuant to article XI of the marital settlement agreement is not alimony because petitioner's liability to make the payment would not have terminated upon Mrs. Sa'd's death. <u>See</u> sec. 71(b)(1)(D).

In determining whether a payment satisfies section 71(b)(1)(D), we examine the divorce or separation instrument to ascertain whether it contains a condition terminating the payor spouse's liability on the death of the payee spouse, and, if it does not, whether State law supplies such a condition in cases in which the instrument is silent. <u>See</u> <u>Hoover v. Commissioner</u>, 102 F.3d 842, 847 (6th Cir. 1996), <u>aff'g</u> T.C. Memo. 1995-183; <u>LaPoint v. Commissioner</u>, T.C. Memo. 2012-107; <u>Sperling v. Commissioner</u>, T.C. Memo. 2009-141; <u>Stedman v. Commissioner</u>, T.C. Memo. 2008-239. Because the marital settlement agreement does not address whether petitioner's obligation to pay Mrs. Sa'd $160,000 would have survived her death, we look to Illinois law to determine whether the obligation would terminate upon the death of Mrs. Sa'd.

**[*11]** Illinois law as applicable in 2001 and currently[8] distinguishes between "provisions as to property disposition" and "the obligation to pay future maintenance." 750 Ill. Comp. Stat. Ann. 5/510(b)-(c) (West 2009 & Supp. 2012). Property disposition provisions cannot be revoked or modified, id. 5/510(b), while future maintenance obligations are automatically terminated upon the death of either party, id. 5/510(c). In making the determination whether the payment obligation is a property disposition or a maintenance payment, "Illinois law is clear that rules of contract construction are applicable to the interpretation of provisions in a marital settlement agreement, and the primary objective is to effectuate the intent of the parties." In re Marriage of Hall, 935 N.E.2d 522, 527 (Ill. App. Ct. 2010).

Within the category of maintenance obligations, Illinois law further distinguishes between periodic maintenance and maintenance in gross, which is defined as a nonmodifiable sum, the right to which is vested in the payee. In re Marriage of Freeman, 478 N.E.2d 326, 329 (Ill. 1985). In the absence of an

---

[8]Illinois' current divorce statute, the Illinois Marriage and Dissolution of Marriage Act, was enacted in 1977. In 1982 the statute was amended to specifically authorize courts to award maintenance in gross. See Public Act 82-716 sec. 1 (eff. July 1, 1982). The provisions of the statute regarding maintenance, as amended in 1982, remained in effect at the time of the Sa'd divorce and currently.

[*12] explicit statement to the contrary, rights to maintenance in gross are not affected by the death of the payee. Id. at 330.

Respondent argues that the $160,000 payment was, on the face of the marital settlement agreement, intended to be a part of the property settlement rather than a support payment and was thus not terminable at death. Petitioner points to the State court's clarifying order issued in 2010, which characterized the sum as an "unallocated support payment", as evidence that the award was intended as support. Respondent rightly notes, however, that the characterization of payments by the Sa'ds or the State court does not determine their character for Federal income tax purposes. Cunningham v. Commissioner, T.C. Memo. 1994-474.

The structure and terms of the marital settlement agreement indicate that the $160,000 payment was in the nature of a property disposition, which under Illinois law was nonmodifiable and would survive the death of the recipient. The provision for the payment is in article XI of the agreement entitled "Bank Accounts, Stocks, Bonds & Investment Funds". There is no mention of it in article III of the agreement, entitled "Unallocated Maintenance and Support".

Control of the funds in Action Mortgage's bank accounts had been a principal focus of the Sa'ds' dispute in the divorce action. Mrs. Sa'd successfully moved for a temporary restraining order, averring that petitioner had assumed

**[\*13]** control of the Action Mortgage bank accounts and removed her name from the accounts. The State court had issued orders limiting petitioner's withdrawals from the accounts to checks necessary for the ordinary conduct of Action Mortgage's business and for the support of petitioner and Mrs. Sa'd in prescribed amounts.

Against this backdrop, the relationship of the two components of article XI becomes clear. Section 1 of article XI required petitioner's payment of $160,000 to Mrs. Sa'd. Section 2 of article XI then provided that each spouse would retain the funds contained in bank accounts in their respective names or under their dominion and control. This juxtaposition strongly suggests that the payment was consideration for Mrs. Sa'd's relinquishment of her equitable claims to the Action Mortgage bank accounts over which petitioner had assumed control.[9] This conclusion is confirmed by the Sa'ds' respective counsels' explanation of the marital settlement agreement to the State court. At the hearing to consider incorporation of the agreement into the divorce judgment, Mrs. Sa'd's counsel

---

[9]In her motion for a temporary restraining order, Mrs. Sa'd had averred that Action Mortgage was founded during the marriage. Under Illinois law, the corporation would therefore be marital property, subject to equitable division. See 750 Ill. Comp. Stat. Ann. 5/503 (West 1999 & Supp. 2012). In granting Mrs. Sa'd's request that petitioner's control of Action Mortgage's funds be restricted during the pendency of the divorce action, the State court presumably accepted Mrs. Sa'd's contention that Action Mortgage was marital property.

**[*14]** explained the agreement to the State court as follows: "That Mr. Sa'd would retain his business, Action Mortgage, along with the remaining cash in the company after paying Mrs. Sa'd one hundred sixty thousand dollars." The conclusion is inescapable that the payment was intended as a property disposition. Consequently, under Illinois law petitioner's obligation to make the payment would have survived Mrs. Sa'd's death.

Even if the State court's clarifying order issued over eight years after the divorce judgment--to the effect that the $160,000 payment was an "unallocated support payment" from petitioner to Mrs. Sa'd--is taken at face value, the characterization of the payment as support would not cause petitioner's obligation to terminate in the event of Mrs. Sa'd's death. The single lump-sum payment, in which Mrs. Sa'd's interest became vested upon the entry of the judgment of divorce, would be classified as maintenance in gross under Illinois law. See In re Marriage of Freeman, 478 N.E.2d at 329. As such, since the marital settlement agreement did not provide otherwise, petitioner's obligation to make the $160,000 payment would have survived Mrs. Sa'd's death. See id. Consequently, the payment is not alimony for Federal income tax purposes. See sec. 71(b)(1)(D).

**[*15]** <u>Monthly Payments</u>

Petitioner contends that the monthly $6,000 payments received by Mrs. Sa'd during the first 10 months of 2001 (pursuant to the interim order) are deductible by him as alimony.[10] The payments at issue were received by Mrs. Sa'd pursuant to the interim order, which as pertinent here provided that "each party shall be entitled to receive $6,000 from the corporate account of Action Mortgage Inc. for support without prejudice to a full hearing."

Section 71(b)(1) defines alimony as "any payment in cash" if the requirements of subparagraphs (A) through (D) are satisfied. Respondent contends that the amounts Mrs. Sa'd received pursuant to the interim order were not "payments" as required by the statute because Mrs. Sa'd herself could "access" the Action Mortgage corporate account to obtain the amount to which she was entitled under the order. Thus, respondent contends, "no 'payments in cash' were 'received' by her in accordance with section 71(b)(1)."

---

[10]In the notice of deficiency respondent allowed an alimony deduction for the two $6,000 monthly payments Mrs. Sa'd received in November and December 2001 pursuant to the marital settlement agreement.

The amount originally deducted on Action Mortgage's return as commissions and disallowed by respondent was $233,574. The evidence in the record establishes that the payments Mrs. Sa'd received from Action Mortgage and/or petitioner in 2001 totaled $232,000 (a $160,000 lump-sum payment and 12 monthly payments of $6,000). Petitioner has not addressed the $1,574 discrepancy, and we accordingly sustain respondent's disallowance of a deduction for that amount.

**[\*16]**  We disagree.  First, we do not believe the evidence supports respondent's contention that Mrs. Sa'd could unilaterally access the corporate bank accounts.  Mrs. Sa'd had sought an order from the State court that her name be placed on the accounts and that her signature be required on checks drawn on them.  The State court did <u>not</u> so order.  Instead, the State court imposed restrictions on petitioner's access to those accounts.  Thus, while the record is somewhat sketchy, we are persuaded by the preponderance of the evidence that Mrs. Sa'd received her monthly payments of $6,000 for the first 10 months of 2001 by means of petitioner's (or someone on his behalf who was authorized to draw on the accounts) writing a check to Mrs. Sa'd.

Second, even if we assume that Mrs. Sa'd could somehow unilaterally draw on the Action Mortgage bank accounts, that fact would not disqualify the amounts withdrawn as alimony.  Respondent's "payments" theory cannot be squared with <u>Jaffe</u>, where we held that the taxpayer husband was entitled to an alimony deduction for amounts that his spouse was <u>entitled to withdraw</u> by order of a divorce court from a money market reserve account they owned jointly as tenants by the entirety.  The alimony deduction was equal to one-half of the amounts withdrawn, corresponding to the portion of the account owned by the taxpayer husband.

[*17] Respondent has not suggested that Mrs. Sa'd had any ownership interest in Action Mortgage for Federal income tax purposes during 2001. Indeed, respondent has accepted Action Mortgage's 2001 return insofar as it reports petitioner as the owner of 100% of the stock of Action Mortgage during 2001 and has determined that petitioner is required to report 100% of the increase determined in Action Mortgage's net distributable income for 2001. Thus, respondent has accepted the position that petitioner was the 100% owner of Action Mortgage during 2001. Accordingly, under the principles of Jaffe, the amounts in Action Mortgage's bank accounts that Mrs. Sa'd received in 2001 pursuant to the State court order were "payment[s] in cash" "received" by her within the meaning of section 71(b)(1).[11] See also Stahl v. Commissioner, T.C. Memo. 2001-22.

---

[11]We acknowledge that under Illinois law, during most of 2001 the stock of Action Mortgage was "marital property" in which "[e]ach spouse has a species of common ownership * * * which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action." 750 Ill. Comp. Stat. Ann. 5/503(e). But the statute further provides that this "common ownership" interest in marital property "shall not encumber that property so as to restrict its transfer, assignment or conveyance by the title holder" unless the title holder is specifically enjoined from doing so. Id. In short, the stock of Action Mortgage was, during most of 2001 until entry of the divorce judgment, marital property subject to equitable distribution by the State court hearing the divorce action. The same was true, however, of the money market reserve account at issue in Jaffe v. Commissioner, T.C. Memo. 1996-196, to which the spouses held legal title as tenants by the entirety.

[*18] Respondent has not otherwise challenged the qualifications of the payments as alimony. They were received under the interim order, which was an order of separate maintenance; the interim order made no designations with respect to income tax treatment; and petitioner and Mrs. Sa'd were not living together when the payments were made. Finally, while the interim order did not provide that the payments would terminate in the event of Mrs. Sa'd's death, as future maintenance payments under Illinois law they would have automatically terminated in the event of the death of either party, given the absence of any provision to the contrary in the order. See 750 Ill. Comp. Stat. Ann. 5/510(c). Accordingly, we hold that petitioner is entitled to an alimony deduction for the $60,000 in payments Mrs. Sa'd received in 2001 pursuant to the interim order.

Attorney's Fees

Petitioner first argues that the $69,000 Action Mortgage paid to Mrs. Sa'd's divorce attorneys is deductible by him because it was for the determination and collection of alimony, citing Hesse v. Commissioner, 60 T.C. 685, 693-694 (1973), aff'd without published opinion, 511 F.2d 1393 (3d Cir. 1975), Wild v. Commissioner, 42 T.C. 706, 710-711 (1964), and Elliot v. Commissioner, 40 T.C. 304, 314 (1963). Petitioner misconstrues these cases. They hold that the attorney's fees of a taxpayer receiving alimony may be deducted as a cost of

 [*19] producing income.  These cases are no help to petitioner as a payor of alimony.  In some circumstances, payment of a spouse's attorney's fees may constitute alimony when the divorce or separation instrument requires it.  See sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., 49 Fed. Reg. 34455, 34455 (Aug. 31, 1984).  But here the marital settlement agreement did not require petitioner to pay Mrs. Sa'd's attorney's fees; it specifically provided that both parties were responsible for their own attorney's fees.

Finally, petitioner claims at one point on brief that the payment was made to his attorneys.  But at trial petitioner testified that the payment was for the attorney's fees of Mrs. Sa'd, and the invoices for legal fees that petitioner submitted to substantiate the expense are from Mrs. Sa'd's attorneys.  Consequently, petitioner's claim that the attorney's fees were paid in order to preserve and protect his assets is meritless.  Even if the fees had been paid to petitioner's attorneys, they were personal, as they arose from a divorce action.  See also United States v. Gilmore, 372 U.S. 39, 48 (1963) ("[T]he characterization, as 'business' or 'personal,' of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities.  It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim[.]").  Petitioner is

**[\*20]** therefore not entitled to a deduction for the $69,000 Action Mortgage paid to Mrs. Sa'd's attorneys.

Medical Payments

In his brief petitioner has not addressed the $5,384 deduction for "Medical Expense" claimed on Action Mortgage's return that respondent disallowed. He is therefore deemed to have conceded it. See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989). Even if not conceded, the claimed medical expenses are not alimony because petitioner conceded at trial that the payments were made for the medical care of his children as required by the marital settlement agreement. Alimony as defined in section 71 specifically excludes child support payments. Sec. 71(c). A payment is a child support payment if the terms of the divorce or separation instrument "fix * * * [the payment] as a sum which is payable for the support of children of the payor spouse." Sec. 71(c)(1). A payment is treated as so fixed if the amount will be reduced either (A) on the occurrence of a specified contingency relating to the child (such as attaining a specified age) or (B) at a time clearly associated with such a contingency, to the extent of the reduction. Sec. 71(c)(2).

Article V of the marital settlement agreement, entitled "Medical and Related Expenses", required that both parties "equally pay all out-of-pocket [medical and related] expenses incurred on behalf of" their children and not covered by health

**[\*21]** insurance. Article V further provided that the foregoing obligation would continue for each child during the period preceding the child's emancipation, defined to include periods of pursuit of higher education, but not beyond age 23. As the obligation for the children's medical expenses would reduce to zero upon their attaining the age of 23, the entire amount is child support and not deductible alimony.[12]

Accuracy-Related Penalty

Respondent determined that petitioner is liable for a 20% penalty under section 6662(a) and (b)(1) and (2) on the basis of (1) negligence or disregard of rules or regulations and (2) a substantial understatement of income tax. As the sole shareholder of Action Mortgage, an S corporation, petitioner is liable for any accuracy-related penalty arising from erroneous deductions claimed on the corporate return. See Deason v. Commissioner, 590 F.2d 1377, 1379 (5th Cir. 1979), aff'g T.C. Memo. 1976-224; Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), aff'g T.C. Memo. 1968-98; Rodriguez v. Commissioner, T.C. Memo. 1986-8.

---

[12]Petitioner did not claim his children as dependents on his 2001 return, nor has he shown that they would qualify as such under sec. 152. Accordingly, the amount at issue would not constitute a deductible medical expense under sec. 213(a).

**[\*22]** Section 6662(a) imposes a 20% penalty for any underpayment attributable to negligence or disregard of rules or regulations. Sec. 6662(a) and (b)(1). Negligence includes any failure to make a reasonable attempt to comply with the internal revenue laws. Sec. 6662(c). It connotes a lack of due care or a failure to do what a reasonable and prudent person would do under the circumstances. <u>Bunney v. Commissioner</u>, 114 T.C. 259, 266 (2000). A disregard of rules or regulations is one that is careless, reckless, or intentional. Sec. 6662(c).

Section 6662(b)(2) imposes a penalty of 20% of any underpayment attributable to a substantial understatement of income tax. An "understatement" is the excess of the amount of tax required to be shown on the return over the amount of tax shown on the return. Sec. 6662(d)(2)(A). An understatement of income tax is substantial when it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). The understatement is reduced by the amount attributable to the tax treatment of any item if there was substantial authority for the taxpayer's treatment of the item or if the taxpayer had a reasonable basis for the treatment and disclosed the relevant facts affecting the treatment on the return or in a statement attached to it. Sec. 6662(d)(2)(B).

The Commissioner bears the burden of production with respect to a taxpayer's liability for penalties. Sec. 7491(c). To satisfy that burden, the

**[*23]** Commissioner must offer sufficient evidence to indicate that it is appropriate to impose a penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). If the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving it is inappropriate to impose the penalty because of any exculpatory factors. Id.

No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith in regard to that portion. Sec. 6664(c)(1). That determination is made case by case, depending on the facts and circumstances. Those circumstances include reliance on a tax professional, if the reliance was in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. To establish that the reliance on a tax professional was in good faith, the taxpayer must show that "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

There is an underpayment of tax in this case attributable to the disallowed deductions that we have sustained for the $160,000 lump-sum payment, the $69,000 payment of Mrs. Sa'd's attorney's fees in the divorce action, the claimed

**[\*24]** $5,384 in medical expenses of petitioner's children, and the unexplained $1,574 excess in the amounts deducted as monthly payments under the interim order.

We are persuaded that each portion of the underpayment arising from the foregoing is attributable to negligence. The lump-sum and attorney's fees deductions were large and warranted greater care than petitioner exhibited in claiming them; the lump-sum payment bore the hallmarks of a property settlement; and the attorney's fees deduction is simply without any legal support. More tellingly, the reporting of these items as "Commissions" and "Consultation expenses", respectively, reflects a deliberate attempt to obfuscate. The deduction of straightforward child support expenses as a business expense is clear negligence, as is the unexplained deduction of the $1,574 excess above the total of the monthly payments under the interim order.

There is no substantial authority for the treatment of the foregoing items on Action Mortgage's return, nor was there disclosure of the facts affecting the treatment. Thus, in the event the understatement arising from these items exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000, the underpayment is also attributable to a substantial understatement of income tax.

**[\*25]** Petitioner claims that his divorce attorney advised him that the $160,000 lump-sum payment was deductible as alimony. Reliance on such advice might constitute reasonable cause. However, petitioner has not explained why, if he thought the payment was alimony, he deducted it as "Commissions". The only evidence that petitioner received legal advice regarding the tax treatment of the lump-sum payment is his own self-serving testimony. His divorce attorney was not called as a witness. Petitioner also emphasizes that the payments at issue were made to his spouse by Action Mortgage because the State court so ordered. However, that is true only with respect to the 10 monthly payments of $6,000 made pursuant to the interim order, the total of which has been allowed as a deduction. There is no evidence, other than petitioner's self-serving testimony, that the State court required payment of any other amounts from the corporate entity. Indeed, the available documentary evidence suggests the contrary. We conclude that petitioner has not shown reasonable cause for the underpayment attributable to the disallowed deduction for the lump-sum payment or for any other portion of the underpayment.

We therefore hold that the underpayment is attributable to negligence and, in the event the understatement exceeds the statutory threshold, to a substantial understatement of income tax.

**[*26]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.