T.C. Memo. 2016-171

UNITED STATES TAX COURT

MARIA G. LESLIE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9894-12L,          Filed September 14, 2016.
               27014-12.

<u>Kevan P. McLaughlin</u> and <u>Tyson P. Cross</u>, for petitioner.

<u>Anna A. Long</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>: These cases arise from the unhappy end to a marriage. Maria Leslie got $5.5 million from her former husband under an agreement that said it would be taxable to her and deductible to him. She sent part of it--about $400,000--to an internet scamster who claimed he would invest it for her in an

[*2] African diamond scheme but who made off with the money. She says the $5.5 million was a nontaxable property settlement and the $400,000 was a theft loss. She also says the IRS should have considered her request for an alternative to forced collection of her tax debt.

FINDINGS OF FACT

A.    The Beginning

Maria Leslie earned a master's degree in public health administration from Berkeley sometime during the `80s. She looked for a job with the state government, and got an interview with the Agricultural Labor Relations Board in San Francisco. There she met Byron Georgiou. The interview went well and the two began working in the same office--Georgiou as a director and Leslie as an entry-level investigator. An office romance bloomed, and the two married.

During the early years of their marriage Georgiou became head of operations on one of Jerry Brown's presidential campaigns. When that ended, he resumed his occupation as an attorney and investor. Leslie described him as a "brilliant man" who had investments all over the world. He held interests in gold mines, a casino ship in Texas, and real estate around the country. He knew, she said, "important people with deep pockets." He was often asked to give lectures because of his "financial and intellectual acumen."

**[*3]** During this time Georgiou remained closely associated with the Democratic Party and nurtured his relationships with candidates and officeholders alike. Georgiou himself even ran for his party's nomination for the Senate from Nevada. After that effort failed, he began working as "of counsel" to Milberg Weiss and, more specifically to a man named Bill Lerach. His position there was more rainmaker than litigator, and he negotiated a deal with the firm that entitled him to receive a 10% referral fee in any class-action litigation he secured.

Georgiou was adept at cultivating relationships, and he and Leslie climbed into ever higher political and social circles. One in particular is important here--a friendship with the general counsel to the Regents of the University of California. In 2002 this friendship helped him land the suit of a lifetime--representing the UC Regents as lead plaintiffs in a class action against Enron.

It would eventually yield him over $50 million in attorney's fees.

B.    The End of a Marriage

Then--and from her perspective all at once--Leslie's marriage came to an end. And so began what would become a lengthy battle with a myriad of psychological and mental-health problems. She began suffering--and currently suffers--from severe major depression, and from schizoaffective disorder, and

[*4] dependent-personality disorder. Her condition darkened once the marital-separation negotiations began in 2003, and she began to plan her own death.

She chose life but was admitted to a hospital for an involuntary psychiatric hold during which she was diagnosed with severe major depressive disorder. As a result of her stay, Leslie was prescribed a series of psychotropic drugs, which included Effexor XR, Abilify, Cymbalta, and Prozac. She continued to require psychological evaluations throughout the years and found herself less than fully able to manage her own financial affairs. It wasn't until a year before trial that she finally stopped taking these medications.

But before this recovery she had to tend to negotiations over the division of marital assets. Georgiou provided and paid for Leslie's attorneys during the negotiations, and over the next three or four years the two were able to thrash out the details. With her health so precarious, these negotiations were difficult for her to endure. She credibly described them as "disjointed" and pointed out that she couldn't endure the marathon sessions that the negotiations required. A major reason for their length was the division of fees that Georgiou hoped would come from the Enron litigation. Georgiou called any payout "pie in the sky," and he had Leslie convinced that the chances of a settlement were bleak and that even with success the referral fee might be as low as $9 million.

[*5]  The negotiations ended with a marital separation agreement (MSA).  A section in the MSA titled "Spousal Support" gave Leslie $7,000 per month in spousal support which would end with either party's death.  Under a separate section titled "Division of Community and Co-owned Property" Leslie was awarded nine of the rental properties--which currently serve as her main source of income--and their related loans.  Under that *same* section, Leslie was awarded 10% of whatever fee Georgiou received as a result of the Enron litigation.  The MSA did not say whether this payment would terminate in the event of either party's death.  Despite the provision's location in a section reserved for divisions of property, the MSA distinguished the Enron fee:

> With respect to any and all fees distributed to Mr. Georgiou as a result of his involvement in the Enron securities litigation through the firms, Mr. Georgiou shall receive ninety percent (90%) as his sole and separate property and Ms. Leslie shall receive ten percent (10%) of all net fees distributed to Mr. Georgiou by the Lerach Coughlin firm or Milberg Weiss firm "the firms".  [*sic*]  Ms. Leslie's ten percent (10%) interest in the Enron fee is a spousal support award from a contingent liability, the amount of which could not be definitely set at the time of this agreement, since Mr. Georgiou cannot be certain of the amount of fees that he will receive from the Enron litigation.  This ten percent (10%) distribution to Ms. Leslie is taxable to Ms. Leslie and deductible to Mr. Georgiou as spousal support.

Under the same section--and contingent on Georgiou's receiving his split of the Enron fees--Georgiou was to pay an additional $355,000 lump sum to Leslie.

[*6] Again, this sum was described as spousal support; the main difference being that it *would* expressly terminate upon Leslie's death.

Not too long after the order dissolving Leslie's marriage in January 2008, the Enron class action ended with a settlement very favorable to the plaintiffs' lawyers. They submitted their fee application to the Federal district court as part of a motion to approve the settlement. In their application the lawyers requested that the court approve attorney's fees of 9.52% of the Regents' ultimate recovery of $7 billion. The court granted that request and awarded $688 million in fees. Georgiou himself received a referral fee of $55 million spread out from 2008 to 2010.

Leslie started to see some money from the deal. First came the $355,000, which was paid out to her in 16 separate payments from July 2006 to April 2007. Then came her share of the referral fee:

| Date | Amount |
|------------|-------------|
| 11/13/2008 | $4,000,000 |
| 12/22/2009 | 1,560,000 |
| 6/28/2010 | 8,200 |
| Total | 5,568,200 |

**[*7]** The 2009 payment had some twists. Georgiou definitely segregated this money from his distribution, and directly deposited it into an account at California Bank & Trust. That account had both his name and Leslie's on it, but she credibly testified that she had no control over it. She was not given any checks to sign from the account, and her impression of the payment was that it wasn't yet legally hers. In January 2010 she tried to gain control by filing a declaration in support of the "Release of Enron Payments from Trust Account" with the San Diego Superior Court. Georgiou opposed her petition, and the state court at first refused to grant it. It's not clear from the record when or if Leslie ever gained control over the account containing the 2009 payment.

## C. The Africa Diamond Scam

While this was happening and shortly before the divorce became final, Leslie had met Eugene McCullough at a local swap meet. McCullough sold golf clubs and accessories, which didn't interest Leslie. Still, as time went by, she and McCullough began a friendship--mostly commiserating about what they were unable to sell that day. She began to trust him. One day McCullough began talking about an old friend of his from his days in the Navy. He explained that the friend had a troubled past, but had since gotten into the diamond business and seemed to be doing very well for himself. Deciding she would like a small pair of

[*8] earrings, Leslie had McCullough reach out to the man. That man's name was Lawyer Stanley.

Leslie estimates that it was about two weeks later when McCullough got back to her and explained that Stanley only did wholesale. Leslie at first didn't think twice about it, but then McCullough came back a few weeks later. He said Stanley had an offer she might be interested in.[1] There was a large shipment of diamonds in Africa that Stanley needed money to export. For the right initial investment, McCullough said, Stanley would give Leslie $1 million once the diamonds were in hand and then resold.

Leslie took this bait and bit down hard. She didn't even sign a contract because she trusted McCullough, and it was only supposed to take 10-30 days for her to see a return on her "investment". She wired a first payment of $320,000 to an entity named Africa World Trade, LLC, at the beginning of December. A few days later, Stanley began emailing McCullough exclaiming that Leslie "could make millions" and that if she would keep providing capital "she [could] own her own bank." Giving into the sense of urgency projected by Stanley's emails, Leslie wired him an additional $60,000. Stanley's excuses for delay began. First, it was

---

[1] Leslie spoke with Stanley only once herself. She explained during trial that she let McCullough handle all contact because he was the one with the relationship with Stanley and that she trusted him absolutely.

[*9] some bank's standing in the way of Stanley's payment to Leslie, then it was delays because of the Christmas holidays, and finally Stanley wrote McCullough another email explaining that "the inland revenue taxes is the last obstacle . . . they raised it 1.0025%," and that he needed additional funds. So, Leslie wired another $25,000 to Stanley.

This was, of course, all a scam of the same kind anyone with an email address has encountered since the opening of the internet. And it played out just as one would expect: More delays followed by more excuses followed by more delays. Leslie finally became leery of her newfound business partner 74 days after her initial "investment." She emailed McCullough and Stanley to complain about Stanley's "over the top" delays but received one last excuse: Stanley needed to get a probate document for some reason or another before he could make the deal go through. The scales cascaded from her eyes, and Leslie threatened to call the police. No progress. More stalling. Stanley did up his game from deceit to outright forgery by creating and sending to her documents from something called the "Foreign Credit Commission" (FCC), but the number shown on the documents was false. Stanley then blamed Leslie for causing more delay by contacting this "FCC." By mid-2009 Leslie realized she had been duped.

[*10] It was too late. Stanley wasn't answering emails or telephone calls. McCullough spoke with several authorities on Leslie's behalf. He contacted the FBI and the district attorney and even reached out to Congress, all to no avail. Leslie personally called the local police in Florida near an address Stanley had given, and asked them to do a welfare visit to Stanley's home, but he'd already skipped town. She spoke with two lawyers but they "laugh[ed] her out of the room" and advised that she shouldn't spend any more good money chasing bad. All that was left was a collection of emails between Stanley and her detailing the course of the transactions from the past year. She never filed suit or made any other claim against Stanley because she simply couldn't even find him. Seeing no other way to benefit from this debacle, she deducted the $405,000 on her 2009 tax return.

D.    The Tax Filings

Before her divorce, Leslie had never before been responsible for managing her day-to-day financial affairs. Her problems during and after her divorce did nothing to sharpen her skills. She credibly testified that during the years after the divorce "the real world just kind of like passed me by completely in terms of my

**[\*11]** obligations, in terms of time--time frames and time lines and duties." She

failed to timely file her 2006-08 tax returns.[2]

She did finally realize that she needed to get her affairs in order and hired a

preparer--the same preparer who did Georgiou's returns--to file her 2006, 2007,

and 2008 tax returns. All three returns reported payments received from Georgiou

as taxable alimony. In spring 2010 the Commissioner assessed failure-to-timely-

pay and failure-to-pay-estimated-tax penalties due to her late filing of the 2007

and 2008 tax returns and mailed separate notices of demand for each year. In

October 2010 the Commissioner filed a notice of lien followed by a final notice of

his intent to levy. In that same month Leslie timely filed her 2009 tax return

reporting the $405,000 theft loss and excluding the 2009 Enron payment from

Georgiou as taxable income.

Leslie timely requested an Appeals Office hearing under section 6330 to

challenge the amount of her tax bill[3] and propose an alternative to forced

---

[2] Leslie received an extension on her 2009 tax return and so it was timely filed.

[3] When the IRS assesses a liability based on a taxpayer's unaudited return, the taxpayer hasn't had an opportunity to "dispute" her tax liability and so is entitled to a CDP hearing. See Montgomery v. Commissioner, 122 T.C. 1, 9 (2004). This is true even in cases where the taxpayer self-reported the amount and wishes to make a change--as Leslie did for her 2007 and 2008 tax years. Id.

[*12] collection. She gave amended 2007 and 2008 returns to the settlement officer (SO) who held the hearing. These returns reported a much smaller alimony and the carryback of part of the theft loss from her 2009 tax return--which greatly reduced her taxable income. She also provided the SO the documentation (including billing statements, her rental real-estate activity, deeds, transfer documents, and bank-account statements) that the IRS needs to even consider alternatives to forced collection. The SO did ask for additional information regarding Leslie's healthcare and life-insurance premiums--six months of statements instead of the three Leslie had already provided. But even though Leslie never provided this additional bit of information, the SO was able to generate an allowable-expense worksheet that showed Leslie could afford a monthly payment of about $5,500. She never repeated her request for the missing insurance information or asked Leslie for anything else.

The Commissioner issued a notice of determination for Leslie's 2007 and 2008 tax years in which he didn't even analyze any collection alternatives. Leslie timely filed a petition with this court. Shortly after that, the Commissioner issued a notice of deficiency for Leslie's 2007, 2008, and 2009 tax years. Leslie timely filed a separate petition to challenge that determination too. We consolidated the

**[\*13]** cases and tried them together in San Diego. Leslie was at the time and

remains a California resident.

## OPINION

The big issue is the taxability of Leslie's share of the Enron referral-fee

windfall. The Commissioner asserts that it's all alimony; taxable to Leslie and

deductible to Georgiou because that's what the marital-settlement agreement said

it was, and because it met the requirements of section 71.[4] Leslie asserts the

payments are a property settlement and thus should not be included in her income.

She also asserts that even if the payments are alimony, the 2009 Enron payment

isn't income to her for that year because she hadn't received it. The parties also

fight about whether Leslie's loss in her dealing with Stanley was a theft loss. And

they fight about whether she owes penalties: The Commissioner asserts section

6651 failure-to-timely-file penalties for Leslie's 2007 and 2008 tax years as well

as section 6662 accuracy-related penalties for all three years at issue. And, finally,

they fight about whether the Commissioner's settlement officer abused her

discretion as part of a collection due process hearing because she failed to

---

[4] All section references are to the Internal Revenue Code in effect for the years at issue, unless we say otherwise. All Rule references are to the Tax Court Rules of Practice and Procedure.

[*14] consider collection alternatives despite Leslie's having provided her financial information.

I.    The Enron Fees

The parties' dispute about the Enron fees starts with a dispute about what test we should use, both for the amount that was contingent and the $355,000 that was defined.[5]  Leslie argues that we should turn to a set of factors under Beard v. Commissioner, 77 T.C. 1275 (1981).  Beard requires the Court to examine the facts of these cases under a set of seven subjective factors--largely the intent of the parties--to determine if a payment is more in the nature of alimony or in the nature of a property settlement.  Id.  But in 1984 Congress amended section 71 of the Code--the purpose of which was to "eliminate the subjective inquiries into intent and the nature of payments that ha[s] plagued the courts."  Hoover v. Commissioner, 102 F.3d 842, 845 (6th Cir. 1996), aff'g T.C. Memo. 1995-183.  The Commissioner wins this one--we'll follow the Code and not prior caselaw-- and we will analyze the treatment of the Enron payments under section 71(b):

_____

[5] As we already noted, $30,000 of the contingent $355,000 was paid to Leslie not in 2007, but in 2006--a year not covered by the notice of deficiency and thus beyond the Commissioner's reach.

[*15] Alimony means any cash payment if:

>       (A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,

>       (B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,

>       (C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and

>       (D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

If a payment satisfies all of these factors then it's alimony. Baker v. Commissioner, T.C. Memo. 2000-164. Leslie concedes the first three but argues that the payments do not satisfy section 71(b)(1)(D)'s requirement that Georgiou's obligation to make these payment end with her death. We begin with the language of the divorce or separation instrument. And it shows that nowhere in the MSA is there a condition that terminates Georgiou's obligation to pay over a part of the contingent referral fee upon Leslie's death.[6] That's not the end of the matter,

_____

[6] As we've already found, the MSA provided for a $355,000 lump-sum payment to Leslie once Georgiou started to receive the fees. The MSA made *that* payment--but not the $5.5 million that became Leslie's additional share of the Enron fees--expressly contingent on Leslie's not dying.

**[\*16]** though, because state law can supply the missing termination-on-death-of-payee condition that section 71 requires. See Hoover, 102 F.3d at 847; Lapoint v. Commissioner, T.C. Memo. 2012-107. Under California law, "[e]xcept as otherwise agreed by the parties in writing, the obligation of a party under an order for the support of the other party terminates upon the death of either party or the remarriage of the other party." Cal. Fam. Code sec. 4337 (West 2013). "A written agreement to waive section 4337 'must be specific and express.'"[7] Johanson v. Commissioner, 541 F.3d 973, 977 (9th Cir. 2008) (quoting In re Marriage of Thornton, 115 Cal. Rptr. 2d 380, 383 (Ct. App. 2002)), aff'g T.C. Memo. 2006-105. The parties here have not produced any such agreement. The mere failure to include language terminating support upon death is not enough to constitute a waiver. Id. By operation of California law, then, payments from the Enron settlement would have terminated upon Leslie's death.

The requirement that any liability to make payments terminates upon the death of the payee spouse is central in distinguishing between alimony and

---

[7] Extrinsic evidence is admissible to determine whether section 4337 was waived only if there is some "language in the written agreement reasonably susceptible to interpretation as a declaration of an intent that support continue beyond [death]." Johanson v. Commissioner, 541 F.3d 973, 977 (9th Cir. 2008) (quoting In re Marriage of Cesnalis, 131 Cal. Rptr. 2d 436, 439-40 (Ct. App. 2003)), aff'g T.C. Memo. 2006-105. Even if we found that the MSA contained such language, neither party produced extrinsic evidence for examination here.

[*17] property settlements. See H.R. Rept. No. 98-432 (Part 2), at 1496 (1984), 1984 U.S.C.C.A.N. 697, 1138; Hoover, 102 F.3d at 845-46. Its presence here by operation of state law means the contingent Enron payments were alimony taxable to Leslie.

We find for the Commissioner on this issue.

II.    Constructive Receipt of the 2009 Payment

Leslie's fallback position is that even if the Enron payments are generally taxable, she didn't receive the 2009 payment in 2009. Giorgiou deposited the payment into an account Leslie herself did not open. She claims that she did not have control over this account; she did not have access to it; and did not even know it existed. Leslie credibly testified that she still didn't have this money until--at the earliest--the 2010 tax year. She argues that the funds were not taxable until then. The Commissioner argues, however, that even if Leslie didn't have knowledge or control over the trust, Georgiou should be considered Leslie's agent, thus giving her constructive receipt over the funds.

Income is generally taxable for the year in which it is received. Sec. 451; sec. 1.451-1(a), Income Tax Regs. But a taxpayer can "constructively receive" income. The doctrine of constructive receipt is summarized by section 1.451-2(a) of the regulations:

[*18] General rule.  Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given.  However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Under the constructive-receipt doctrine, a taxpayer is required to recognize income when she has an unqualified, vested right to receive immediate payment.  Ross v. Commissioner, 169 F.2d 483, 490 (1st Cir. 1948), rev'g and remanding on other grounds 6 T.C.M. (CCH) 124 (1947); Martin v. Commissioner, 96 T.C. 814, 823 (1991); Palmer v. Commissioner, T.C. Memo. 2000-228, 2000 WL 1036368, at *9.  Whether a taxpayer has constructive receipt of income is a question of fact.  Martin, 96 T.C. at 822.

This Court has held that knowledge of the funds' receipt--something Leslie didn't have--is necessary for constructive receipt.  Furstenberg v. Commissioner, 83 T.C. 755, 792 (1984) (citing Davis v. Commissioner, T.C. Memo. 1978-12).  But once Leslie did become aware that the funds were in an account she still had no power to get them.  Her petition to a state court to win release of the funds

**[*19]** shows her lack of control. And the Commissioner's argument crumbles completely when one sees that the state court at first denied that petition.[8]

The Commissioner's argument that Georgiou acted as Leslie's agent is also faulty. Receipt by an agent is receipt by the principal, Gale v. Commissioner, T.C. Memo. 2002-54, but the Commissioner has provided no evidence, nor does there exist on the record any evidence suggesting that Georgiou had any authority to act as Leslie's agent. Georgiou's interest was adverse to Leslie's: When Leslie tried to get the court to release the 2009 payment to her, he opposed it.

We find for Leslie on the issue of constructive receipt and hold that she did not receive the 2009 Enron payment in the 2009 tax year.

III.    Theft Loss

Section 165(a) allows a deduction against a taxpayer's ordinary income for "any loss sustained during the taxable year and not compensated for by insurance

---

[8] The reason was that Leslie at that time had sued to overturn or modify the MSA on the ground that she lacked capacity to agree to it because of her medical problems. The state court didn't want to release the funds to her under the MSA if she later were successful in overturning the MSA altogether. The MSA was later upheld by the trial court and again on appeal in 2013. See In re Marriage of Georgiou, 160 Cal. Rptr. 3d 254 (Ct. App. 2013). There is nothing in the record that clearly shows if and when Leslie got this money. But it certainly wasn't in 2009.

**[\*20]** or otherwise." Loss deductions are very limited for individuals, but they do include losses that arise from a theft. Sec. 165(c).

We look to the law of the state in which the loss occurred to determine whether a loss was a theft loss. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), aff'g 61 T.C. 354 (1973). While a theft loss doesn't require proof of a conviction,[9] Paine v. Commissioner, 63 T.C. 736, 740 (1975), aff'd without published opinion, 523 F.2d 1053 (5th Cir. 1975), the burden is on Leslie to prove by a preponderance of the evidence that a theft occurred under California law, see Halata v. Commissioner, T.C. Memo. 2012-351.

**Was There a Theft?**

Section 484 of the California Penal Code defines theft:

> (a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other

---

[9] The Commissioner noted during trial that Leslie made no headway with police enforcement on this matter, nor did she sue or file an administrative claim against Stanley. Leslie asserts that despite McCullough's several efforts on her behalf she was unable to even locate Stanley. But neither a criminal case nor a civil suit is required to prove a theft loss--we've even held that taxpayer doesn't even need to know who the thief is. Halata v. Commissioner, T.C. Memo. 2012-351; Jensen v. Commissioner, T.C. Memo. 1993-393 (allowing theft loss where insurance broker unwittingly invested taxpayer's money in a Ponzi scheme) aff'd without published opinion, 72 F.3d 135 (9th Cir. 1995).

**[*21]** person of money labor or real or personal property, * * * is
guilty of theft.

California cases define the crime of theft by false pretenses to consist of three

elements:

- the making of false pretense or representation by the defendant;

- the intent to defraud the owner of his property; and

- actual reliance by the owner upon the false pretense in parting
with his property.

People v. Williams, 161 Cal. Rptr. 3d 81, 89 (2013); People v. Fujita, 117 Cal.

Rptr. 757, 764 (Ct. App. 1974).

But first a taxpayer must establish that failure to keep the promise was not

merely a result of a commercial default. Barry v. Commissioner, T.C. Memo.

1991-382 (citing People v. Poyet, 99 Cal. Rptr. 758 (1972)). We typically find

that the failure to keep a promise is the result of a commercial default in those

cases where the taxpayer entered a contract with a legitimate business. See Bellis

v. Commissioner, 61 T.C. 354 (no theft loss from stock purchase in legitimate

business later bankrupt); see also Barry, T.C. Memo. 1991-382 (no theft loss from

bad business deal).

Lawyer Stanley's business was not legitimate. And that makes this case

situation much more like Halata, T.C. Memo. 2012-351. In Halata, the taxpayer

[*22] entered into a deal in which she was to receive a $2.5 million return on an initial investment of less than $200,000. Id. In executing the deal, the scammer gave her a collection of supporting documents--which we later found "phony." Id. at *23. The taxpayer contacted a state prosecutor, but to no avail. Id. at *15. We found the entire transaction to be fictitious by reasoning that:

- the documents appeared to be fake,

- the purported return on investment was "too good to be true"--an obvious indicator of a fraudulent scheme, and

- the lack of a contract was far more consistent with a scam than with an investment.

Id. at *23.

Leslie received even less documentation than the taxpayer in Halata: only a suspicious "FCC" document that we also find was phony. Very much like the taxpayer in Halata, Leslie expected a return--double her investment in only 10-30 days--that was too good to possibly be true. Even more compelling here is that Leslie never received a written contract before wiring her money to "Africa World Trade, LLC." We find Stanley's representations to be fraudulent and the whole deal a scam.

Another element of the offense is that a promise to the taxpayer must be made with the intent not to perform. People v. Kiperman, 138 Cal. Rptr. 271

**[\*23]** (App. Dep't Super. Ct. 1977). We can think of no plausible intent on Stanley's part other than to defraud her of her money and never perform the deal he promised. Halata, T.C. Memo. 2012-351, at \*23 (finding that phony documents were consistent only with an intent to deprive the taxpayer of her money).

We also find that Leslie actually relied on Stanley's promise of a high return. California courts have held that even reliance by a foolish victim of an absurd fraud is nonetheless reliance. Barry, T.C. Memo. 1991-382 (citing People v. Gilliam, 297 P.2d 468 (Cal. Ct. App. 1956)). There is nothing in the facts to indicate that Leslie initially believed that Stanley was not a legitimate businessman. Even if Leslie had been suspicious of Stanley's promises--which she wasn't--she came across no evidence to suggest that the transaction was a scam. See People v. Marghzar, 239 Cal. Rptr. 130, 136 (Ct. App. 1987) (reliance found even where victim suspicious).

Accordingly we find that Leslie's $405,000 loss was the result of a theft.

**When Was the Theft?**

A taxpayer is generally permitted to deduct a theft loss in the year she discovers it unless there is a claim for recovery, in which case we treat the loss as sustained when it can be determined with reasonable certainty that she won't obtain reimbursement. See sec. 165(e); secs. 1.165-1(d)(2)(i), (3), 1.165-8(a)(2),

[*24] Income Tax Regs.; <u>Jeppsen v. Commissioner</u>, 128 F.3d 1410, 1414 (10th Cir. 1997), <u>aff'g</u> T.C. Memo. 1995-342. Leslie's theft occurred in 2008 when she wired $405,000 to Stanley. She didn't realize that she'd been scammed, however, until 2009, and she has no pending claim for recovery against Stanley. It was also in 2009 that Leslie abandoned any legal avenues in obtaining reimbursement from Stanley after McCullough's contacts with police enforcement and her own contacts with her attorneys proved unfruitful. McCullough's and Leslie's failed attempts to get reimbursement in that year are enough for us to find that Leslie had no reasonable prospect of recovery. <u>See</u> <u>Halata</u>, T.C. Memo. 2012-351, at *28. Thus, Leslie's theft loss was *sustained* in the 2009 tax year.

We find for Leslie on this issue.[10]

IV.  <u>Penalties</u>

A.  <u>Late Filing</u>

Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer can establish reasonable cause. The Commissioner has met his burden of production on this one because Leslie concedes that she filed

---

[10] The excess of deductions over gross income is a net-operating loss. <u>See</u> sec. 172(c). To the extent that Leslie's loss exceeds her income she may carry back her loss first to 2007--two years before the loss. <u>See</u> sec. 172(b)(1)(A)(i). We leave these calculations for Rule 155.

[*25] her 2007 and 2008 returns late. She asserts as a defense, however, that she had reasonable cause because of her ongoing psychological problems.

Incapacity on the part of a taxpayer because of mental illness can be a reasonable cause for failing to file timely returns. Williams v. Commissioner, 16 T.C. 893, 906 (1951); Wilkinson v. Commissioner, T.C. Memo. 1997-410, 1997 WL 570863, at *7. But the taxpayer must show that her mental or emotional disorder "rendered [her] incapable of exercising ordinary business care and prudence during the period in which the failure to file continued." Wilkinson, 1997 WL 570863, at *7. We acknowledge that Leslie was diagnosed with several serious mental disorders and was taking medicine for depression. But the standard is a tough one to meet, and we did not see enough evidence of her inability to manage her other business affairs during this time. She was, for example, living in substantial part on the income from eight rental properties she got in the divorce, which required her active involvement in their management. We acknowledge she had problems doing this, but because she was still able to live on this income we find that her ability to "carry on normal activities" was not so impaired as to be an inability. See id. This is not enough to excuse a late filing.

We find for the Commissioner on this issue.

**[\*26]** B.     Accuracy-Related Penalties

Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax attributable to a substantial understatement of income tax. Leslie concedes accuracy-related penalties imposed by the Commissioner to the extent that we found deficiencies for the 2007 and 2008 tax years.  And we found for her on the merits of her 2009 tax year.

This is a split decision.

V.     CDP

Once the Commissioner assesses a tax, but before he can collect any unpaid portion of it, he must give a taxpayer the opportunity for a collection due process (CDP) hearing.  See secs. 6321, 6331(a).  A taxpayer can raise any relevant issue during the hearing, including an alternative to forced collection.  Sec. 6330(c)(2)(A).  One such alternative is an installment agreement.  Secs. 6159(a), 6330(c)(2)(A)(iii).

Although Leslie's arguments during the CDP hearing focused on her underlying liability, she distinctly asked for a collection alternative (despite the Commissioner's assertion to the contrary).  She now requests a remand on the grounds that the SO failed to consider a collection alternative, and we review this part of the determination for abuse of discretion.  See Sego v. Commissioner, 114

**[*27]** T.C. 604, 6010 (2000); <u>Goza v. Commissioner</u>, 114 T.C. 176, 182 (2000).

Courts generally hold that a decision maker abuses his discretion "when [he] makes

an error of law * * * or rests [his] determination on a clearly erroneous finding of

fact * * * [or] 'applies the correct law to facts which are not clearly erroneous but

rules in an irrational manner.'" <u>United States v. Sherburne</u>, 249 F.3d 1121, 1125-

26 (9th Cir. 2001) (citations omitted) (quoting <u>Friedkin v. Sternberg</u>, 85 F.3d 1400,

1405 (9th Cir. 1996)).  The Courts have recognized that the Appeals Office needs

financial information to evaluate a collection alternative and that it is not an abuse

of discretion for an SO to decline to consider alternatives where a taxpayer fails to

submit requested financial information.  See <u>Lance v. Commissioner</u>, T.C. Memo.

2009-129 (citing <u>Schwersensky v. Commissioner</u>, T.C. Memo. 2006-178).

The Commissioner does argue on brief here that the SO was within her

discretion to deny collection alternatives because Leslie didn't supply information

about her health- and life-insurance premiums.  This was, however, just about the

only financial information that Leslie didn't supply.  Even more important, this

specific failure--a failure to supply complete information about health- and life-

insurance premiums--is not cited in the notice of determination as a reason for

refusing to consider an alternative to enforced collection.  In reviewing notices of

[*28] determination, we follow the Chenery doctrine.[11]  See Jones v. Commissioner, T.C. Memo. 2012-274; Salahuddin v. Commissioner, T.C. Memo. 2012-141, 2012 WL 1758628, at *7.  Applying Chenery in a CDP case means that we can't uphold a notice of determination on grounds other than those actually relied upon by the IRS officer who made the determination.  See Chenery I, 318 U.S. at 87-88; Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) (agency has the responsibility to articulate its reasoning); Salahuddin, 2012 WL 1758628, at *7 ("[O]ur role under section 6330(d) is to review actions that the IRS took, not the actions that it could have taken").  Those grounds must be clearly set forth so that we do not have to guess about why an officer decided what he did.  See Chenery II, 332 U.S. at 195.

Unlike many taxpayers, Leslie submitted a complete Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, along with a current set of her financial records.  This enabled the SO--even without the additional health- and life-insurance statements--to generate an allowable-expense worksheet.  In her notes the SO acknowledged that Leslie had proposed a

_____

[11] The Chenery doctrine is an administrative-law principle that says a court, in reviewing a determination which an "administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); SEC v. Chenery Corp., 318 U.S. 80 (1943).

[*29] collection alternative but instead of, for instance, disallowing that part of Leslie's claimed expenses and computing a higher installment payment she simply rejected any alternative at all.  This makes the determination not rational, in contrast to the run-of-the-rejection-mill case where a taxpayer submits no information or leaves out assets.  Cf. Gillum v. Commissioner, T.C. Memo. 2010-280, aff'd, 676 F.3d 633 (8th Cir. 2012) (excluding information about assets is failure to provide information necessary for evaluation).

We therefore hold that the SO's failure to consider a collection alternative in this case was an abuse of discretion.  We will remand the case to the Appeals Office to hold a supplemental hearing after the parties complete their Rule 155 computation.

Decision in docket No. 27014-12 will be entered under Rule 155, and an appropriate order will be issued in docket No. 9894-12L.